**TRADEMARK RESEARCH CORPORATION, Plaintiff–Appellee–Cross–Appellant,**

v.

**MAXWELL ONLINE, INC., Defendant–Appellant–Cross–Appellee.**

Nos. 1076, 1077, Docket Nos. 92–7839, 92–7869.

United States Court of Appeals, Second Circuit.

Argued March 4, 1993.

Decided May 18, 1993.

Lawrence O. Kamin, New York City (James D. Goldsmith, Laura U. Brett, Willkie Farr & Gallagher, New York City, of counsel), for defendant-appellant-cross-appellee.

George F. Pappas, Washington, DC, (James R. Myers, Gary M. Hnath, Venable, Baetjer, Howard & Civiletti, Washington, DC, and Gerald J. Fields, Raymond J. Soffientini, Battle Fowler, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Before NEWMAN, PIERCE and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

Defendant Maxwell Online, Inc. ("Maxwell Online") appeals from a July 13, 1992 judgment entered on a jury verdict in the Southern District of New York (Lee, *Magistrate Judge*), finding it liable for breaching a contract to design and input a trademark database and search system for plaintiff Trademark Research Corporation ("TRC"). TRC had sought $4,477,141 in damages for lost profits from the sale of a computer product known as CD–ROM, $3,106,756 in damages for lost profits from in-house trademark searches, $4,319,559 in damages for "wasted expenses," and punitive damages. Maxwell Online moved for a directed verdict with respect to, *inter alia*, each of TRC's four categories of damages. The trial court dismissed the claim for lost profits from CD–ROM sales and the claim for punitive damages. The jury awarded TRC $1,000,000 for lost profits from in-house searches and $2,711,728 for wasted expenses. The jury found for TRC on Maxwell Online's counterclaim for unpaid bills. The trial court denied Maxwell Online's motion for judgment n.o.v.

· Maxwell Online contends that the trial court erred in failing to grant Maxwell Online judgment as a matter of law on TRC's claim for lost profits from in-house trademark searches and for wasted expenses incurred as consequential damages. Alternatively, Maxwell Online seeks a new trial on the issue of damages, arguing that the trial court erred in (1) refusing to allow Maxwell Online's expert witness to critique certain elements of the damage calculations proffered by TRC's expert; (2) refusing to qualify a Maxwell Online witness as an expert on database design; (3) sustaining objections to three hypothetical questions posed on cross-examination to TRC's expert; (4) refusing to instruct the jury that TRC was required to prove its consequential damages with "reasonable certainty"; and (5) denying a new damages trial to redress improper comments by TRC's counsel during summation. Maxwell Online also argues that it is entitled to a new trial on the claim and counterclaim because the trial court committed reversible error in its jury instructions on the issue of liability for breach of contract.

TRC cross-appeals from the judgment insofar as the trial court dismissed TRC's claim for lost profits from the sale of CD–ROMs—a new computer product marketed by TRC that was made possible by the trademark database and search system. TRC also contends that the district court erred in denying its request for prejudgment interest.

We reverse the judgment insofar as it awards damages for TRC's lost profits. We find there was insufficient evidence to support particular elements of the damages award for wasted expenses, but affirm the award for such expenses because it is within the maximum range the jury could properly have awarded. We affirm in all of the numerous other respects.

## I. BACKGROUND

TRC has been in the business of producing trademark search reports since 1949. Formerly known as Trademark Services Corporation, TRC is an indirect subsidiary of Commerce Clearing House, Inc. ("CCH"), a conglomerate of businesses providing law-related services and products. The trademark search market has been dominated by a handful of firms, one of which, Thomson & Thomson, has enjoyed a 75 percent market share in recent years. Customers use trademark search reports to compare proposed trademarks with previously registered trademarks in order to identify any potential for confusion that may affect approval of the new mark by the United States Patent and Trademark Office. Accuracy and thoroughness are essential attributes of trademark search reports because the launching of a new trademark usually entails a large investment.

Prior to 1992, TRC catalogued its trademark information on five million three-by-five-inch index cards and conducted in-house trademark searches by manual review of those files. In the mid–1980s, some of TRC's competitors computerized their trademark files and search process. Computerized search systems, while not necessarily more accurate than manual searches, are more efficient, produce more attractive search reports, and enable search firms to market direct access to their trademark databases. TRC continued using its manual system and began losing market share and money.

In 1985, TRC hired BRS Information Technologies ("BRS") to create a prototype of an automated trademark database and search system. BRS later became a division of Maxwell Online. BRS completed that project in 1987 and was paid approximately $150,000. Although TRC was satisfied with the prototype, it apparently was not ready at that time to take the next step of converting from a manual to a computerized search system. In December 1987, CCH asked one of its executives, Donald Borgese, to take over as president of TRC and to evaluate TRC's business prospects in view of its eroding market share. Among the options considered was going out of business. Mr. Borgese concluded that TRC could survive if it automated, and that it should hire BRS to accomplish this goal because of TRC's satisfactory experience with BRS in developing a prototype.

In 1988, TRC and BRS began negotiating for a full-scale database. By August 1988, BRS started work on the database and later that month issued a proposal to TRC setting forth, among other things, a timetable for completion of the database and a fee schedule. On September 14, 1988, the parties signed a Declaration of Intent (the "Declaration") which states in its entirety:

> Trademark Service Corporation (TSC) and BRS Information Technologies agree to proceed with the creation of the Trademark Database.
>
> The preliminary proposal discussed today will be further refined and expanded, but database loading and programming activities will commence on September 15, 1988.
>
> The parties agree to reconvene in early October, 1988, to finalize the agreement and sign a contract.
>
> Until then, BRS will bill TSC monthly on a time and costs basis. The storage, load and update fees will be as stated in the preliminary proposal.

The Declaration is the only executed writing governing the parties' agreement.

The parties attempted to draft the full-dress contract contemplated by their Declaration. BRS submitted drafts to TRC in November 1988 and in the middle of 1989. No final contract was executed, in part because the drafts mistakenly assigned to BRS database-related tasks that TRC had already contracted out to other vendors.

Shortly after the Declaration of Intent was signed, BRS learned that it was to be ac-

quired by Maxwell Communication (Delaware), Inc. ("Maxwell Communication"). On November 23, 1988, Maxwell Communication entered into a Purchase Agreement with the entity that then owned BRS. The acquisition was consummated in January 1989. After a series of corporate mergers and name changes, BRS emerged as a division of a Maxwell Communication affiliate called Maxwell Online. For convenience, the parties have referred to the acquiring entity as Maxwell Online.

The record reflects that BRS was aware that time was of the essence in completing the database project, that BRS told TRC that the database and search system would be available for demonstration at the April 1989 annual meeting of the United States Trademark Association ("USTA"), and that Maxwell Online was made aware of this urgency. TRC contends that its contract with BRS required the delivery of a fully operational database no later than January 1990, but that, as a result of Maxwell Online's breach, delivery of an operational system was delayed until January 1992.

BRS's main business had been the design of databases and corresponding "search and retrieval" software, and the provision of access to such databases through online text retrieval services. Its new corporate parent, Maxwell Online, was in a different business: putting databases online. As a result of personnel changes following Maxwell Online's takeover, BRS lost several executives and other employees who had been working on the TRC database project. Delays accumulated, and many of the items that were delivered were faulty. TRC protested, and Maxwell Online repeatedly assured TRC that the database would be completed on time. Nevertheless, the database was not sufficiently developed to be shown at the April 1989 USTA meeting, or at the USTA's April meeting the following year.

This commercial atmosphere generated billing disputes. Pursuant to the Declaration of Intent, Maxwell Online was supposed to bill TRC on a "time and costs" basis. TRC paid bills rendered through May 1989, totaling approximately $161,000. Maxwell Online did not get around to submitting another bill until November 1989. Upon receipt of the November 1989 bill, and every bill thereafter, TRC requested data to substantiate what it saw as exorbitant and erroneous charges. Maxwell Online concedes that its November 1989 statement reflected double billing and that there were some discrepancies in some other bills as well. Maxwell Online never explained its bills to TRC's satisfaction, and TRC made no further payments. At the time of trial, Maxwell Online sought approximately $400,000 on its counterclaim for unpaid bills.

As the delays and problems mounted, the parties tried to resolve their differences in a series of meetings and telephone conversations that culminated in a high-level meeting at LaGuardia Airport on May 23, 1990. At the LaGuardia Airport meeting, Maxwell Online's president, James Terragno, told TRC's representatives:

> I think you got the wrong company. It's not our business. It's never been our business. . . . I wouldn't take on this project today.

Thus Maxwell Online proposed that it relinquish the TRC database project to another vendor. Mr. Terragno candidly allowed at the meeting that he should have focused on TRC's complaints six months previously, but TRC was not mollified.

Soon after the LaGuardia Airport meeting, TRC hired International Computaprint Corporation ("ICC") to finish the database project. Maxwell Online agreed to turn over its work product to ICC on the condition that TRC place approximately $303,000 in escrow pending resolution of this dispute, as security for the unpaid bills. At trial, an ICC witness testified that TRC would have been better off "starting from scratch" rather than using the inferior database materials developed by Maxwell Online.

TRC accepted delivery of the completed database from ICC on December 31, 1991. By the time of trial in May 1992, TRC was able to demonstrate a significant sales increase for in-house trademark searches in the first four months of 1992, using the automated search system, as compared with its

use of the old manual system in the first four months of 1991.

As an alternative (or supplement) to written search reports prepared in-house by a trademark search firm, a firm with a computerized trademark database can also market direct access to its database, which can be arranged in one of two ways: (a) the customer's computer terminal is connected by modem to an online text retrieval service that contains the database, which the customer can then search for a fee that usually varies with usage; or (b) the customer purchases a periodically updated series of compact disks called CD–ROMs (Compact Disk–Read Only Memory) that store the database and with which the customer can conduct its own unlimited searches on its own computer terminal for a flat fee. TRC claims to have had substantial success marketing CD–ROMs after the belated delivery of the database.

In August 1990, TRC commenced this suit, alleging various causes of action including breach of contract, breach of warranty, and negligent misrepresentation. TRC ultimately sought damages of approximately $4.5 million for lost profits from CD–ROM sales; $3.1 million for lost profits from in-house searches; and $4.3 million for "wasted expenses" comprising twenty separate categories of expenditures that were either made necessary, or rendered economically useless, by reason of the breach. TRC also sought punitive damages. Maxwell Online counterclaimed seeking as damages the approximately $400,000 in unpaid bills, on various theories including breach of contract and quantum meruit.

The case was assigned to Judge Robert J. Ward. By stipulation of the parties and order of the district judge, the case was tried to a jury before Magistrate Judge Barbara A. Lee, pursuant to 28 U.S.C. § 636. At the close of the evidence at trial, each party moved under Fed.R.Civ.P. 50(a) for a directed verdict dismissing the other's claims. As to Maxwell Online's Rule 50(a) motion, the trial court granted it in part, dismissing TRC's claims for negligent misrepresentation, breach of warranty, punitive damages and lost profits arising from CD–ROM sales. The Rule 50(a) motions were denied in all

other respects. The trial court observed, however, that TRC's claim for lost profits from in-house searches presented a close call, and provided the jury with a special verdict form that would separately reflect the amount of damages, if any, awarded for lost profits and for wasted expenses. Maxwell Online had sought a more specific verdict form that would particularize each category of wasted expenses to facilitate review of the verdict, which form the trial court in its discretion decided not to use.

The jury reached a verdict in favor of TRC on the remaining claims and on the counterclaims, and awarded TRC damages of $1 million for lost profits from in-house searches and approximately $2.7 million in the aggregate for wasted expenses. After the verdict, Maxwell Online moved under Rule 50(b) for judgment as a matter of law or, in the alternative, a new trial; TRC moved for prejudgment interest. The trial court denied both motions. These appeals followed.

## II. DISCUSSION

Both parties have appealed from the trial court's Rule 50 decisions on the lost profit issues. In section A below, we hold that none of TRC's claims for lost profits should have been submitted to the jury. Thus, we affirm the trial court's dismissal of TRC's claim for lost profits from CD–ROM sales; and we reverse the denial of judgment n.o.v. as to TRC's claim for lost profits from in-house searches and the resulting $1 million verdict.

Maxwell Online also seeks reversal of the damages award for wasted expenses, arguing that the evidence was insufficient to submit to the jury. In section B, we affirm the verdict because it is within the maximum range the jury could properly have awarded. In section C, we reject Maxwell Online's argument that it is entitled to a new trial on the issue of damages by reason of claimed trial errors. In section D, we reject Maxwell Online's contention that the jury instructions concerning liability for breach of contract were erroneous. In section E, we affirm the trial court's denial of prejudgment interest.

### A. Judgment as a Matter of Law as to Lost Profits Damages

■ TRC claimed damages for lost future profits resulting from the alleged two year delay in delivery of the trademark database. At trial, TRC's accounting expert, Terry L. Musika, testified that if the database had been completed as promised by January 1, 1990, TRC would have earned additional profits in the years 1990 through 1998: approximately $4.5 million from CD–ROM sales and $3.1 million from in-house searches. Maxwell Online offered the testimony of Dr. Steven Schwartz, an economist, to rebut Mr. Musika's presentation and to offer a competing damages analysis.

New York law permits recovery of lost future profits as damages for breach of contract subject to the following stringent requirements:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986) (per curiam) (citations omitted) (*Kenford I*). A new enterprise, such as TRC's CD–ROM product, is subject to an even stricter standard for lost profits damages:

> If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.

*Id.*

*Kenford I* concerned the County of Erie's breach of a 20–year contract under which the plaintiffs were to manage a new domed stadium to be built near Buffalo. Plaintiffs had hoped to profit from a number of related business opportunities, including a baseball franchise for the stadium, an office building development, and the appreciation of surrounding land owned by one of the plaintiffs. The Court of Appeals reversed a jury award for lost profits damages, finding the evidence legally insufficient because (1) the parties had not contemplated that the County would be liable for plaintiffs' lost profits over the length of the contract, and (2) the expert proof as to the success of this proposed professional sports facility lacked reasonable certainty. *Id.* at 261–62, 502 N.Y.S.2d at 133, 493 N.E.2d at 235–36.

In a later decision in the same case, *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) (*Kenford II*), the Court of Appeals reversed a damages award for lost anticipated appreciation in the value of Kenford's land holdings and took the opportunity to reinforce the principle that "damages which may be recovered by a party for breach of contract are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed." *Id.* at 321, 540 N.Y.S.2d at 5, 537 N.E.2d at 180. The court observed that the parties' "hope or expectation" that the domed stadium would lead to an economic boom in the County does not "necessarily or logically lead[ ] to the conclusion that the parties contemplated that the County would assume liability for Kenford's loss of anticipated appreciation in the value of its peripheral lands if the stadium were not built." *Id.* at 319–320, 540 N.Y.S.2d at 4, 537 N.E.2d at 179. The court observed that Kenford voluntarily and knowingly assumed the risk that its collateral investments would suffer if the stadium were not built, and that it was irrational to conclude that the County agreed to guarantee land values whether or not the stadium was built. *Id.* at 321, 540 N.Y.S.2d at 5, 537 N.E.2d at 180.

TRC has failed to establish its lost future profits with the degree of certainty required by *Kenford I* and *Kenford II*, and has failed to establish that liability for such damages

were contemplated by the parties at the time of contracting.

## 1. The requisite certainty of losses

In support of its lost profits claim, TRC offered lengthy testimony and voluminous documentation. TRC's expert calculated lost profits damages by reference to: the performance of comparable companies; market studies; TRC's business plans and promotional plans; and TRC's subsequent sales and earnings in the months following the delivery of the completed database. However, even drawing all inferences in TRC's favor, as we must, we find the record is insufficient to support any award for lost profits. TRC's lost profits presentation depended entirely on speculation of a particularly dubious kind. Mr. Musika assumed an abrupt expansion of the market for trademark search services, assumed that TRC would reverse the long decline in its market share, assumed that TRC's historically aggressive competitors would take no measures to counter TRC's ascendancy, and predicted which choices customers would make among a variety of new and old search technologies—all of these assumptions reduced to speciously exact dollar amounts and spun out to the year 1998.

With respect to the in-house search business, TRC's own proof would support the conclusion that the total market for search reports is likely to shrink as the development of online services and CD–ROMs enable customers to conduct their own trademark searches. TRC nevertheless contended at trial that it would overcome the market trend toward customer-conducted searches and that its own market share for search reports would increase from 4% to over 23% in nine years, reversing six years of losses. TRC offered no historical basis for these projections other than a market share in the single digits for at least a decade prior to automation. Mr. Musika predicted that TRC would duplicate the success of a competitor that had computerized in the early 1980's, even though the competitor had a different business structure and had computerized at a time when the market was booming and when there were fewer competitors. To project that the overall market for in-house searches would expand and that TRC's individual market share would also increase, on this record, is to hope against hope. The evidence cannot support a lost profits award. See Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 510 (2d Cir.1989) (lost profits damages found speculative where plaintiff's sales performance had been "consistently poor").

As to CD–ROMs, the trial court properly concluded that they were a new product and therefore subject to the stricter evidentiary standard for lost profits under Kenford I. Since CD–ROM technology had never been applied to trademark searches prior to 1988, TRC could offer neither a historical basis nor a competitor's experience in support of its lost profits projection. Nor may TRC extrapolate seven years of lost profits from four months of CD–ROM sales in 1992. See Ciraolo v. Miller, 138 A.D.2d 443, 444, 525 N.Y.S.2d 861, 862 (2d Dep't 1988) (one-month profit history is unduly speculative basis for award of twelve months' lost profits). On this record, the future of the CD–ROM market is subject to too many uncertain variables to project lost profits with the requisite certainty.

TRC urges that its lost profits claim finds support in Care Travel Co. v. Pan American World Airways, Inc., 944 F.2d 983 (2d Cir. 1991), where the issue of lost profits was permitted to go to the jury. Care Travel had been general sales agent for Pan Am in London with exclusive rights under an agency agreement to sell Pan Am tickets to Karachi and Bombay. Pan Am breached that agreement by allowing a second British company, Empire Travel, to sell Pan Am tickets to those two locations. Id. at 985–87. Care Travel sought damages equal to what it would have received in commissions on the tickets sold by Empire Travel if Care Travel had sold them instead. The damage award was premised on the cautious assumptions that the same total number of Pan Am tickets would have been sold absent the breach, and that Care Travel would have sold all of them under the exclusive sales arrangement. Id. at 994–95. Mr. Musika's data concerning the future sales and profits of a turnaround

company in a market being transformed by technology is by contrast a network of conjecture. Mr. Musika's lost profits projections are therefore incapable of supporting a damages award.

### 2. Damages contemplated by the parties

TRC's lost profits claim fails for the independent reason that liability for such damages were not fairly contemplated by the parties at the time of contracting. *Kenford I,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d at 235. The Declaration of Intent, the only executed writing governing the database project, does not mention damages. In the absence of a contractual provision governing the availability of lost profits damages as a remedy for breach, New York law requires us "to consider what the parties would have concluded had they considered the subject." *Id.* at 262, 502 N.Y.S.2d at 133, 493 N.E.2d at 236. TRC had the burden of proof on this issue and the record evidence is slim.

TRC argues that BRS accepted liability for lost profits damages related to in-house searches because BRS knew when it undertook the database project that TRC had to automate in order to survive. However, BRS's awareness that there was a large downside risk for TRC militates *against* the idea that BRS would have embraced it. *See Goodstein Constr. Corp. v. City of New York,* 80 N.Y.2d 366, 375, 590 N.Y.S.2d 425, 430, 604 N.E.2d 1356, 1362 (1992) ("the City's knowledge of the details of plaintiff's plans and cost estimates does not suggest that the City was agreeing to underwrite the hypothetical profits from these plans ...."). The record contains no specific evidence that, at the time of contracting, BRS accepted liability for nine years of lost profits. No evidence was offered that the parties ever discussed lost profits liability. The parties' fully executed 1985 contract for the prototype database expressly provided that BRS would not be liable for "incidental, consequential, loss of business, special or indirect damages of any nature whatsoever." The informality of the Declaration of Intent and the parties' prior contracting history confirm that Maxwell Online was entitled to judgment as a matter of law dismissing TRC's claims for lost profits from in-house searches.

As to lost profits related to CD–ROM sales, TRC's only argument is that BRS was aware of the existence and importance of CD–ROM technology, and was aware that TRC was considering marketing some type of public access to its database. This showing does not begin to evidence a contractual intent that Maxwell Online would accept lost profits liability for this new potential use of the technology. Even if we accept TRC's version of events, as we must, at most TRC discussed with BRS its intention of using the trademark database to introduce a CD–ROM product to be developed by another vendor. On this record, the trial court correctly held that the evidence was insufficient to support a finding that the parties contemplated liability for CD–ROM lost profits damages. *See Kenford II,* 73 N.Y.2d at 321, 540 N.Y.S.2d at 5, 537 N.E.2d at 180 (hope that contract performance would yield secondary financial benefit does not amount to assumption of liability for damages).

### B. Sufficiency of Evidence as to Wasted Expenses Damages

■ Maxwell Online argues that there was insufficient evidence to submit the issue of wasted expenses damages to the jury. TRC had "the burden of proving the extent of the harm suffered" as a result of Maxwell Online's breach. *Berley Indus., Inc. v. City of New York,* 45 N.Y.2d 683, 686, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 282 (1978). New York law does not countenance damage awards based on "[s]peculation or conjecture"; "there must be a definite and logical connection between what is proved and the damages a jury is asked to find." *Id.* at 687, 412 N.Y.S.2d at 591, 385 N.E.2d at 283, *cited in Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1010 (2d Cir.1991). Maxwell Online denounces Mr. Musika for charlatanry, and asserts that his wasted expenses calculations were so confusing, arbitrary and wrongheaded that Maxwell Online was entitled to judgment n.o.v. on this issue. Judgment n.o.v. is appropriate only if, viewed in the light most favorable to TRC, "the evidence is such that, without weighing

the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970).

TRC's proof of wasted expenses damages consisted primarily of the testimony of its executives, Mr. Borgese and Alan Davidson, and the testimony and work papers of Mr. Musika, the accountancy expert. The gist of TRC's proof was that the late delivery of an operational database caused TRC to spend resources of time and money it otherwise would not have spent gearing up for the expected automation, preparing for promotional events that could not take place, and maintaining the status quo at the company during the period of delay. Mr. Musika helpfully formulated twenty categories of expenditures which, over the course of four years, 1988 through 1991, were rendered waste by reason of Maxwell Online's breach.

For most of his expense categories, Mr. Musika provided detailed explanations as to which portion was wasted and which portion was attributable to ordinary operations or to the creation of the successful database. For some of the expense categories, Mr. Musika employed the questionable, although not legally insufficient, method of calculating the average percentage of revenues spent by TRC on a particular expense category for the years 1985 through 1987, applying the resulting percentage to the revenues for the years 1988 through 1991, and ascribing expenditures above the benchmark percentage in that category largely to damages caused by Maxwell Online. For some expense categories, Mr. Musika calculated waste by reference to direct proof such as invoices for stopgap services and materials needed to tide TRC over the period of delay, and employee time records showing the labor attributable to the unsuccessful Maxwell Online project. For a few expense categories, the damages estimate was purely arbitrary.

Maxwell Online had ample opportunity to cross-examine this testimony on wasted expenses. Dr. Schwartz, called by Maxwell Online to provide an alternative approach for calculating wasted expenses, conceded that the jury could properly award at least $800,000 of the approximately $4.3 million claimed in wasted expenses if it found Maxwell Online in breach. On appeal, most of Maxwell Online's criticisms concerning the wasted expenses award go to the weight of the evidence, not to its sufficiency, and raise questions of fact that were properly decided by the jury. The jury was free to accept or reject the approach offered by either expert, and its award of $2.7 million in wasted expenses arguably shows discrimination in accepting some or parts of the damage claims and rejecting others. This is not a situation where "the leap required to derive any rational conclusion from the expert's data was too great to allow a jury to take." *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *see also Care Travel*, 944 F.2d at 995 ("The compromise nature of the verdict gives rise to an inference that the jury considered both parties' arguments and attempted to arrive at a reasonable estimate of appellee's damages.").

Although much of TRC's claim for wasted expenses damages is sustainable on the current record, certain amounts claimed as waste lack any evidentiary basis and should not have been submitted to the jury. We identify those amounts below, but affirm the award of $2.7 million because it is well within the maximum amount of wasted expense damages supported by the record.

*1. 1991 expenses for "advertising" and for "travel and entertainment business meals"*

█ TRC included as wasted expenses a portion of its outlays for "advertising" and for "travel and entertainment business meals" in 1988 through 1991. Mr. Musika calculated waste in these two expense categories by using the years 1985 through 1987 as a benchmark for the percentage of revenues that would have been spent on those expense categories (absent the breach) in the years 1988 through 1991. This methodology, applied by Mr. Musika in several expense categories, is aggressive but not categorically inadmissible. However, drawing all inferenc-

es in TRC's favor, a rational juror could not have awarded damages for the expense categories of advertising and of travel and entertainment business meals in the year 1991.

By summer 1990 ICC had replaced Maxwell Online as the vendor for the project, and by August 1990 Maxwell Online had turned over all database materials it had prepared. There is no doubt in the record that by 1991, TRC knew the database would be long delayed, and that TRC could plan its advertising on the basis of the progress ICC was making on the project. It makes no sense to assume that in 1991 TRC's advertising, travel or other promotional expenditures were being influenced or misdirected by Maxwell Online's prior work on the database project or Maxwell Online's schedule for completion. Yet Mr. Musika's technique produced wasted advertising expenses of $119,872 and wasted travel and entertainment business meal expenses of $2,319 in 1991. In arriving at these two amounts, Mr. Musika specified no particular advertising campaign and no particular promotional trip or business meal in 1991 dedicated to the promotion of TRC's automated products or services. No identifiable expenditures added up to these amounts. The evidence is legally insufficient to support wasted expenses damages for advertising and for travel and entertainment business meals in 1991.

### 2. Payments to Maxwell Online

■ Maxwell Online had billed a total of approximately $450,000 for the development of the database at the time it relinquished the project. TRC conceded that it received $80,000 in value from Maxwell Online's efforts; subtracting one from the other, TRC characterized $375,538 in Maxwell Online billings as wasted expenses. The undisputed evidence, however, shows that TRC had actually paid Maxwell Online only $161,574 of the total. TRC's presentation thus justified at most an award of $81,574 for Maxwell Online's work (the amount actually paid less the benefit conferred).

The record also shows, however, that, after Maxwell Online abandoned the database project, it required TRC to deposit into an escrow fund an additional $303,220.26 in exchange for the release of database materials to TRC's new vendor. The escrow agreement provides for return of that money to TRC if it is determined in this action that Maxwell Online is not entitled to any payment from TRC. Because TRC prevailed on Maxwell Online's counterclaim, a result that is unchanged by the outcome of these appeals, we assume that the escrow agent will return the money to TRC, if the agent has not already done so. We can find no record evidence of any other payment by TRC to Maxwell Online. Thus the evidence is sufficient to support only $81,574 of TRC's $375,-538 claim for wasted payments to Maxwell Online.

### 3. Temporary employees

■ Under the expense category "maintaining paper records," TRC claimed damages of $256,612, representing 90 percent of all of TRC's expenditures for temporary employees over the four year period. According to Mr. Davidson, TRC hired temporary workers to maintain its system of five million three-by-five-inch index cards pending delivery of an operational database, but would have hired less-costly permanent employees to perform this function had Mr. Davidson known that the database would be delayed. The reason Mr. Davidson gave for not hiring permanent employees to begin with was that he did not want to have to fire them after the brief period by which he initially anticipated that TRC's search reports would be automated. This testimony, uncontradicted on the record, precludes any award for temporary help expenses in 1988 and 1989, years in which TRC would necessarily have incurred such costs even if the database had been delivered on time.

As to 1990 and 1991, the proper measure of damages should have been the difference between what temporary employees actually cost TRC and what any necessary permanent employees would have cost the company. In allocating 90 percent of the non-permanent payroll to "waste" for all four years, Mr. Musika conceded that he applied no particular methodology and that he did not attempt to identify particular invoices or employment agency records correlated to the amount he

claimed was wasted on temporary employees. Mr. Musika's intuited amount for this wasted expense is entirely arbitrary and contradicted by the evidence. Because Maxwell Online admitted liability for $115,893 of the award in this category, we deduct that amount from Musika's estimate of $256,612 and find the evidence legally insufficient to support $140,-719 of the damages claimed for temporary employees.

### 4. Remittitur or new trial not warranted

■ In total, the evidence was insufficient to support $556,874 of the $4.3 million claimed for wasted expenses damages. However, the jury awarded a lump sum of $2.7 million for wasted expenses damages, without specifying particular amounts for particular categories of expenses. Thus, we cannot determine whether any of the unsubstantiated portions of the claimed damages were included in the jury award. We next consider whether these circumstances justify remittitur.

"It is well-settled that calculation of damages is the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990). Nevertheless, we have found remittitur appropriate in at least two distinct kinds of cases: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, ... and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984). This case falls somewhere between the two previously recognized categories of remittitur cases. Although we have identified error in quantifiable amounts, no one can determine whether the jury included any or all of this amount in the verdict. If it could be demonstrated that the verdict included any of TRC's unsubstantiated damages claims, the award would be by definition excessive.

With respect to jury awards that are "intrinsically excessive," we have applied the least intrusive standard for calculating remittitur, reducing the verdict "only to the maximum that would be upheld by the trial court as not excessive." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir.1990); *see Ismail*, 899 F.2d at 186; *Reinertsen v. George W. Rogers Constr. Corp.*, 519 F.2d 531, 532 (2d Cir.1975). As we wrote in *Earl*, this standard for calculating remittitur best serves the "two principal objectives" of remittitur: (i) "to enable the parties to avoid the delay and expense of a new trial when a jury award is intrinsically excessive" and (ii) "to minimize the extent of judicial interference with a matter that is otherwise within the jury's domain." 917 F.2d at 1328. Under this standard, we review the jury award "to determine whether it exceeded the reasonable range." *Ismail*, 899 F.2d at 186.

The jury award of $2.7 million does not exceed the reasonable range for wasted expenses damages. The maximum amount of wasted expenses damages supportable by the record was approximately $3.75 million ($4.3 million requested less $556,874 that is unsupported by the evidence). Thus, the evidence supported an award for wasted expenses one million dollars greater than the jury actually gave. Remittitur of the $556,874 under these circumstances would curtail the jury's prerogative. Nor is there a basis for a new trial, because the jury award was *"clearly within the maximum limit of a reasonable range."* *Ismail*, 899 F.2d at 186 (citing *Reinertsen*, 519 F.2d at 532 (quotation omitted)).

■ We have considered that TRC opposed Maxwell Online's request to provide the jury with a special verdict form that would separately quantify the dollar amount for each of TRC's twenty categories of wasted expenses. Although it was within the trial court's discretion to prefer the simpler verdict form used here, a special verdict form is to be recommended where the nature of the evidence on damages presents the possibility of piecemeal disallowance on a motion for judgment n.o.v. or on appeal. Where categories of damages are easily segregable and are contested on independent legal grounds, the use of a neutrally worded special verdict form increases the likelihood that the ultimate judgment reflects the findings of

the jury. A claimant's tactical opposition to a special verdict form may sometimes justify remittitur, casting upon that party the risk of uncertainty as to whether the jury included in its award items of damages that are later disallowed on post-verdict motion or on appeal. We need not decide whether to adopt that approach in this case, however, because the district court's decision to submit a simpler verdict form was supported by sufficient stated grounds other than TRC's opposition; and because the deficiencies in the damages award relate to portions of certain wasted expenses categories rather than to entire categories, so that the proposed special verdict form, if used, would not necessarily have eliminated the uncertainty that confronts us.

We thus affirm the award of $2,711,728 for wasted expenses damages.

## C. New Trial as to Damages

Maxwell Online contends in the alternative that it is entitled to a new trial on the entire issue of damages because of errors by the trial court concerning: (i) the scope of expert testimony, (ii) the jury instruction on wasted expenses damages, and (iii) improper summation remarks by TRC's counsel. We affirm each of the trial court's rulings as to these issues.

### 1. Trial court's rulings on expert testimony

■ The trial court limited the trial testimony of two of Maxwell Online's expert witnesses, and sustained objections to three questions Maxwell Online posed to one of TRC's expert witnesses. The qualification of expert witnesses and the scope of their examination lie within the sound discretion of the trial court, the exercise of which must be sustained unless manifestly erroneous. *See N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 590 F.2d 415, 418 (2d Cir.1978); *United States v. Green*, 523 F.2d 229, 237 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); Fed.R.Evid. 702. Only if the alleged errors were prejudicial do they furnish grounds for reversal. *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 496 (2d Cir.1985). None of the

trial court's rulings here was either manifestly erroneous or prejudicial.

### a. Testimony of Dr. Schwartz

■ The trial court refused to allow Dr. Schwartz, an economist, to critique Mr. Musika's wasted expenses calculations to the extent such a critique required accounting expertise that Dr. Schwartz conceded he did not possess. The court expressly permitted Dr. Schwartz to present his own views on calculating wasted expenses damages, to explain why his calculations should be preferred, and to show why Mr. Musika should not have estimated damages by averaging expenses if actual expense figures were available. The trial court found that Dr. Schwartz, though not an accountant, had the expertise necessary to identify the source of certain of Mr. Musika's numbers, aided by an enlargement of Mr. Musika's work papers; however, it forbid Dr. Schwartz from opining that the accountant should have selected certain specific numbers rather than others in calculating wasted expenses, expressing concern that such testimony would confuse the jury and invite speculation. The trial court couched its ruling as one that would be applied on a question-by-question basis:

> Now, if this comes up again[,] that is the way I am going to analyze it, on which side of the line does a particular question or a particular answer fall.

> To the extent that it can be reasonably found that he is expressing an opinion about something in his area of expertise, I am going to resolve the doubt in [Maxwell Online's] favor, as I have done with respect to this line of questioning generally. But where it seems to me that he is verging over into an area where he is not an expert, then that is going to be excluded.

This narrow ruling was within the bounds of the trial court's discretion.

In any event, Maxwell Online was not prejudiced by the circumscribing of Dr. Schwartz's testimony. During argument on this matter, Maxwell Online submitted to the trial court an offer of proof as to Dr. Schwartz's excluded testimony. Although the trial court did not address each paragraph of the proffer, none of the anticipated

testimony categorically oversteps the boundaries set by the trial court. Most of the anticipated testimony was in fact elicited at trial or was cumulative in view of the two days of cross-examination of Mr. Musika. None of the proffer appears to critique Mr. Musika's work product in a manner that requires an accountant's expertise, and there is therefore no reason to assume that the trial court would have applied its ruling to bar properly framed questions to elicit such testimony.

### b. Testimony of Mr. Paulsen

■ Maxwell Online sponsored Joseph Paulsen as an expert in "search and retrieval" software and in the management of database projects. During voir dire, Mr. Paulsen disclaimed expertise in database design or in any type of software other than that developed by BRS. The trial court found Mr. Paulsen qualified as an expert in BRS search and retrieval software, but ruled that Maxwell Online had not demonstrated that the oversight and management of database projects constituted a field of expertise or specialized knowledge. Accordingly, the trial court precluded Mr. Paulsen from expressing an *expert* opinion that some of the delays in the delivery of the database were attributable to ICC rather than to Maxwell Online. The trial court ruled that Mr. Paulsen's *lay* opinion in this area may be admissible under Fed.R.Evid. 701, and would be dealt with on a question-by-question basis. The trial court's findings are supported by the record, and its ruling was not an abuse of discretion. Again, to the extent testimony was omitted on the subject of responsibility for delays, that omission is apparently attributable to a decision by Maxwell Online's counsel to avoid testing the limits of the trial court's ruling.

### c. Cross-examination of Mr. Musika

■ The trial court precluded Maxwell Online's counsel from asking TRC's expert, Mr. Musika, three hypothetical questions. Mr. Musika's calculation of damages assumed that the trademark database was not delivered until December 31, 1991. Some evidence supports a December 31, 1991 delivery date. Other evidence suggests the earlier delivery of all the essential components. Counsel for Maxwell Online asked Mr. Musika whether his opinion as to lost profits damages would change if he assumed that TRC had a trademark database in April 1991, June 1991, or September 1991. The trial court sustained the objections to the first two questions, finding the trial record insufficient to support hypothetical delivery dates in April 1991 and June 1991. Although the court found adequate evidence to support the third hypothetical date, it sustained the third objection as well because the question would have been more confusing than helpful to the jury in view of the record as a whole.

■ There is no absolute right to ask a hypothetical question on cross-examination. "[T]he proper scope for cross-examination is, like the qualification of witnesses, a matter of trial court discretion which we do not lightly disturb." *N.V. Maatschappij*, 590 F.2d at 421. We cannot say that the preclusion of these three questions amounted to manifest error. In any event, Maxwell Online cross-examined Mr. Musika for nearly two days and was not prejudiced as a result of the preclusion of these three questions.

### 2. Jury instructions on wasted expenses

■ Maxwell Online contends that the trial court committed reversible error in failing to instruct the jury that wasted expenses must be proved with "reasonable certainty." A trial court's improper charge constitutes reversible error only "when jury instructions, taken as a whole, give the jury a misleading impression or inadequate understanding of the law." *Carvel Corp. v. Diversified Management Group*, 930 F.2d 228, 232 (2d Cir. 1991). Here, the instructions as a whole sufficiently covered the law of contract damages.

The trial court charged that all damages must be: "proven by a preponderance of the evidence"; "directly traceable to the breach"; "the direct result of defendant's failure to perform its obligations under the contract"; and "in the amount necessary to put it in as good a position as it would have been if the other party had performed." With respect to "wasted expenses," the court instructed the jury to determine as to each item wheth-

er the expense was attributable to Maxwell's breach or would have been incurred in any event. The court further charged the jury to consider whether the amounts claimed as wasted expenses "are reasonable." While we might have worded the instructions differently, the trial court's failure to invoke the phrase "reasonable certainty" as to wasted expenses did not mislead the jury and was not reversible error.

### 3. Summation Comments by TRC's Counsel

■■■■■■ Maxwell Online cites several occasions on which it claims TRC's counsel in his summation improperly vouched for Mr. Musika. All but one of the challenged summation remarks were proper recapitulation of Musika's qualifications. On one occasion, TRC's counsel's improperly vouched for Musika's ability: "I recommended ... that TRC hire Terry Musika." Maxwell asked for and received a curative instruction: "that [TRC's counsel] had recommended Musika as an expert ... is not evidence and you are to disregard it." The trial court also charged on several other occasions that statements by counsel are not evidence. It must be assumed that the jury followed instructions. In any event, TRC's counsel's remarks were not so prejudicial as to warrant a new trial.

### D. Jury Instructions as to Liability for Breach of Contract

Maxwell Online argues that the jury instructions concerning liability for breach of contract, "taken as a whole, give the jury a misleading impression or inadequate understanding of the law," Carvel Corp., 930 F.2d at 232, and that it is therefore entitled to a new trial on the claims and counterclaims. Maxwell Online contends that the trial court erred twice in its instructions: (1) by refusing to instruct the jury that it could consider whether TRC's failure to pay bills was a material breach of contract sufficient to excuse subsequent nonperformance by Maxwell Online; and (2) by instructing the jury that TRC's failure to pay Maxwell Online's bills was not a breach of contract if there was a billing dispute and if any of TRC's complaints about the bills proved to be valid.

The trial court gave extensive instructions on the law of breach and repudiation of contracts. The relevant portion of the charge stated:

You may find a breach of contract if you find an unexcused failure to perform an express or implied contractual duty, or if you find a repudiation of the contract by one party that was not agreed to by the other....

. . . .

. . . . [I]f you find that BRS stopped work under the contract solely because TRC had breached the contract, that is not a repudiation....

. . . .

Thus far I have been discussing these principles of the law of contracts in terms of plaintiff's contentions that BRS breached the contract. The same principles of law apply to defendant's counterclaim that TRC breached the contract. If you find that TRC refused to make payments that it had agreed to make for work that was actually done, that constitutes a breach by TRC and you should go on to determine defendant's damages on the counterclaim.

But if you find that the work was not done or if you find that BRS's bills were false or materially inaccurate and that TRC made timely requests for correction of errors or documentation of the work done, then in either of those circumstances the failure to pay the disputed bills was not a breach of contract.

These instructions sufficiently covered the essential issues and did not tend to confuse the jury as to the applicable law.

### 1. Instruction that material breach excuses subsequent nonperformance

■■■■ Maxwell Online contended at trial that any failure on its part to perform could be excused by TRC's prior material breach of contract in suspending payments. Maxwell Online submitted a proposed amendment to charge that iterated at least four times the general principle that material breach excuses subsequent nonperformance. At the charge conference, Maxwell Online also requested orally that the jury be instructed

specifically to consider whether TRC's nonpayment of bills beginning in November 1989 was a material breach of contract that excused Maxwell Online's subsequent repudiation.[1]

The jury instructions expressed these principles as follows: "if you find that BRS stopped work under the contract solely because TRC had breached the contract, that is not a repudiation"; and "[i]f you find that TRC refused to make payments that it had agreed to make for work that was actually done, that constitutes a breach by TRC." Considered as a whole, these instructions adequately conveyed the applicable law. Comparing these instructions to Maxwell Online's proposed amendment to charge, the only difference appears to be that the trial court refused to repeat these instructions like a mantra. "If the charge as given is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it, the judgment will not be disturbed because further amplification is refused." *Oliveras v. United States Lines Co.*, 318 F.2d 890, 892 (2d Cir.1963), *cited in Fernandez v. Fitzgerald,* 711 F.2d 485, 487 (2d Cir.1983).

In any event, the jury's verdict renders moot Maxwell Online's claim of error as to the sufficiency of the instruction that material breach excuses subsequent nonperformance. The jury found in TRC's favor on Maxwell Online's counterclaim for the unpaid bills. It necessarily follows: (a) that the jury found that TRC did not owe any more money than it paid; and (b) that TRC's nonpayment was *not* a breach of the contract. Therefore, TRC's nonpayment could not have excused Maxwell Online's breach.

### 2. *Instruction that TRC's nonpayment was no breach if TRC had valid complaints about the bills*

. As to its counterclaim, Maxwell Online argues that the jury instructions erroneously conveyed the impression that any material error in any of the bills would have excused TRC for an unlimited period of time from paying any and all amounts otherwise payable. This argument mischaracterizes the charge, which we find to be adequate under the circumstances of this case. The trial court charged that TRC was in breach if it failed to make payments that it had agreed to make for work that was actually done. The court further instructed:

> But if you find that the work was not done or if you find that BRS's bills were false or materially inaccurate and that TRC made timely requests for correction of errors or documentation of the work done, then in either of those circumstances the failure to pay the *disputed* bills was not a breach of contract.

(Emphasis added.) The court did not instruct, as Maxwell Online contends, that a billing dispute over any one of the bills would relieve TRC from paying any or all of them. It cannot be said that the verdict was a product of misleading or erroneous jury instructions, particularly since Maxwell Online conceded that some of its bills were false or inflated; and its own expert testified that Maxwell Online's performance under the contract should be valued at $80,000, substantially less than the approximately $161,000 already paid, not to mention the $400,000 more sought on the counterclaim.

### E. Prejudgment Interest

TRC's cross-appeal also challenges the trial court's denial of its motion,

---

1. As the trial court observed, Maxwell Online's theory that its repudiation was excused by TRC's prior breach was first raised during this litigation. TRC's delinquency in making payments, however, began in November 1989 and only after it had identified billing errors and problems in Maxwell Online's performance. At the time, neither party considered TRC's nonpayment to constitute a breach of contract. Maxwell Online did not contemporaneously take the position that it was entitled to stop working until all bills were current. Rather, Maxwell Online continued attempting to perform until the May 1990 LaGuardia Airport meeting when it relinquished the database project. Even then, Maxwell Online did not justify its resignation of the project on the ground that it was owed money. Only when litigation began did Maxwell Online contend that TRC's nonpayment excused Maxwell Online's nonperformance. To the extent the evidence at trial supported this contention, the jury instructions were adequate. *See Franks v. United States Lines Co.*, 324 F.2d 126, 127 (2d Cir.1963) (charge sufficient if it assures a party "a fair consideration of all of his theories").

under Fed.R.Civ.P. 59(e), for prejudgment interest on its damages. The availability of prejudgment interest in this diversity suit is determined by state law, which here provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y.Civ.Prac.L. & R. 5001(a) (McKinney 1992). In an action at law, prejudgment interest is recoverable as of right. *Hilord Chem. Corp. v. Ricoh Elec., Inc.,* 875 F.2d 32, 39 (2d Cir.1989). However, New York law also provides that where there is a possibility that the jury award already allowed interest, no further prejudgment interest can be recovered on the verdict. *See Men's World Outlet, Inc. v. Estate of Steinberg,* 101 A.D.2d 854, 855, 476 N.Y.S.2d 171, 172 (2d Dep't 1984) (reversing grant of statutory prejudgment interest because of possibility, raised by trial court's jury charge as to interest, that the jury already allowed interest).

The trial court denied TRC's request for prejudgment interest under CPLR 5001(a) because the damages TRC had sought from the jury included a computation of interest on the wasted expenses. One of Mr. Musika's twenty categories of wasted expenses was denoted "interest." Explaining this category, Mr. Musika testified:

> The interest was calculated on the basis of the total consequential damages shown here. On an annual basis, each year, I concluded and broke down the $4.3 million number into an annual number. They lost a certain amount of dollars every year. I concluded further, then, that that amount of money had to be borrowed. It had to come from somewhere. There was a cost of funds; somebody didn't give them the money. I then calculated an interest expense for that portion of the damages that were incurred in that year. If there were $20,000 of damages in 1989, I applied an interest rate.

In total, Mr. Musika calculated $189,752 in interest. The trial court properly found that this portion of Mr. Musika's testimony on wasted expenses amounted to a request for the type of interest contemplated by CPLR 5001(a).

TRC argues on appeal that Mr. Musika's "interest" category represented interest only on certain "intercompany loans" and raised no possibility that prejudgment interest was included in the verdict. However, Mr. Musika's testimony was categorical: "They lost a certain amount of dollars every year.... [T]hat amount of money had to be borrowed.... There was a cost of funds.... I then calculated an interest expense for that portion of the damages that were incurred in that year." This testimony raises more than a possibility that the verdict included prejudgment interest of the type contemplated by CPLR 5001(a). The submission of the interest issue to the jury precluded the court from amending the judgment with a potentially duplicative interest award.

TRC argues alternatively that, even if the jury had awarded some prejudgment interest, the award would not make TRC whole because its post-trial calculations show that it is entitled to $424,616 in interest, while Mr. Musika at trial calculated only $189,752. According to TRC, the trial court should have made up the difference on the Rule 59(e) motion. As noted previously, the jury awarded a lump sum for wasted expenses damages without specifying whether any of the award was for interest expenses. New York law, however, precludes an additional award of prejudgment interest if the possibility exists that the jury's award includes any prejudgment interest. We thus affirm the trial court's denial of TRC's Rule 59(e) motion.

## III. CONCLUSION

The judgment of the trial court is affirmed as to the $2,711,728 award for wasted expenses and is reversed as to the $1,000,000 award for lost profits. Judgment is to be entered consistent with the above.