KIDDER, PEABODY & CO. INCORPORATED, Plaintiff,

v.

IAG INTERNATIONAL ACCEPTANCE GROUP N.V., Defendant.

No. 94 Civ. 4725(CSH).

United States District Court, S.D. New York.

Nov. 17, 1998.

As Amended Nov. 18, 1998.

---

**128**

Morrison & Foerster, LLP, New York City, for plaintiff; Carl H. Loewenson, Jr., of counsel.

Curtis Mallet–Prevost, Colt & Mosle, New York City, for defendant; Sam Rosenthal, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This case, arising from a failed financing deal, has been the subject of numerous opinions by this Court and the supervising Magistrate Judge, familiarity with which is assumed. A previous opinion dismissed the complaint which alleged that the defendant IAG International Acceptance Group N.V. ("IAG" or "IAG N.V.") breached a contract with plaintiff Kidder, Peabody & Co. Incorporated ("Kidder") requiring Kidder to provide IAG a three-year $100 million revolving line of credit (a "warehouse facility") to finance the purchase of auto loans and granting Kidder the exclusive right to underwrite securities backed by those loans. Dismissal of the complaint did not dispose of this action because IAG has asserted six counterclaims against Kidder alleging that it has been damaged by Kidder's alleged fraudulent or negligent misrepresentations in connection with the financing contract and Kidder's commencement of this action and procurement of an *ex parte* order of attachment in this Court. Jury trial on the counterclaims is scheduled to begin January 4, 1999.

Kidder, whose only role now is that of counterclaim defendant, has moved for summary judgment seeking (1) dismissal of Count Four of the Amended Counterclaim alleging wrongful attachment under N.Y. CPLR 6212(e), (2) dismissal of Count Five of the Amended Counterclaim insofar as it alleges tortious interference with contractual relations with CS First Boston ("First Boston"), (3) to preclude the recovery of damages derived by IAG from a contract Kidder alleges to be illegal, and (4) to preclude the recovery of damages from lost future profits in respect of that contract. IAG both opposes that motion and affirmatively moves to have it stricken in its entirety, or alternatively, to have numerous exhibits upon which it relies stricken, for failure of the supporting evidence to comply with the authenticity and admissibility requirements of Fed.R.Civ.P. 56(e).

For the reasons explained below, IAG's motion to strike is denied and Kidder's motion for summary judgment is granted insofar as it seeks preclusion of lost future profits damages and dismissal of the wrongful attachment counterclaim. It is denied in all other respects.

## BACKGROUND

Because the factual background of this case has been previously described by this Court, the facts relevant to this opinion will be repeated only briefly. Unless otherwise noted, the facts described are uncontested.

IAG was incorporated in November, 1993 to engage in the business of acquiring, securitizing, and selling auto and light truck loans. Auto Marketing Network, Inc. ("AMN") during the pertinent times engaged in the origination and purchase of loans to sub-prime (that is, less than fully creditworthy) borrowers, secured by automobiles and light trucks. IAG alleges that its principals entered into an agreement with AMN in late 1993 pursuant to which IAG was given the exclusive right to purchase AMN loans and engage in sales of securities backed by pools of such loans. Prior to execution of the contract, which also required IAG to obtain a

revolving line of credit to finance the purchase of AMN loans, AMN's origination of loans had been partially financed by Memorial Bank, an Oklahoma commercial bank whose CEO, H. Buchanan Howard, was involved in the establishment of IAG. Prior to 1994, AMN's loans had been securitized through Daiwa Financial Corp.

As the AMN contract contemplated, IAG sought the desired financing and in January 1994, IAG and Kidder entered into a contract requiring Kidder to provide IAG a $100 million warehouse facility for a three-year period to finance the purchase of AMN loan receivables. This contract also provided that Kidder would serve as IAG's exclusive underwriter in connection with the issuance of securities backed by the receivables. The warehouse facility was not, however, effectuated immediately. Various obstacles arose to the implementation of the terms of the contract, the details of which the parties contest and are not relevant here. Apparently as a result of these complications, between April and June of 1994, Kidder and IAG negotiated the terms of a proposed securitization of a pool of AMN loans. IAG alleges that when it became apparent by June 22, 1994 that neither the securitization transaction nor the warehouse facility would be consummated by June 30, 1994, AMN and IAG entered into discussions with First Boston for the purchase of AMN loans in order to effect the timely removal of those loans from Memorial Bank's books. IAG alleges that First Boston agreed on June 24, 1994 to purchase from AMN the loans that were to be the subject of the proposed Kidder securitization in a whole loan purchase transaction (that is, a straight sale, not a securitization, of the loans). IAG contends that the parties agreed that IAG would be paid a 2% annual structuring fee for this transaction by First Boston together with a 1% up-front fee by AMN.

After learning of the imminent First Boston transaction, Kidder initiated this lawsuit on June 27, 1994,[1] by filing a complaint alleging breach of contract by IAG. On June 28, Kidder obtained an *ex parte* order of attachment from this Court to secure any assets of

or indebtedness owed to IAG, and furnished copies of the order on that same day to First Boston, AMN and Memorial Bank. AMN closed the whole loan sale with First Boston on June 30, 1994, without the involvement of IAG.

After First Boston advised the United States Marshal for this District that it held no property of or indebtedness to IAG, Kidder consented to a vacatur of the order on August 10, 1994. IAG subsequently filed an Amended Counterclaim alleging that Kidder's commencement of the lawsuit and procurement of the order of attachment caused AMN and First Boston to cease doing business with it on the June 30 whole loan sale and any future transaction. IAG further claims that as a result of the lawsuit and the order of attachment, Kidder prevented IAG from doing business with any other entity in connection with the sale or securitization of AMN loans.

## DISCUSSION

The principles governing the grant or denial of summary judgment are well established. "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.), *cert. den.*, —— U.S. ——, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). In addressing a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

1. The parties dispute whether the complaint was in filed on June 27, as the court docket shows, or June 28, as Kidder's filing fee receipt shows. This dispute is not material to the motions at bar.

Once such a showing is made, the party opposing the motion must come forward with "*specific facts showing that there is a genuine issue for trial.*" Fed.R.Civ.P. 56(e). In so doing, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, while the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Instead, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Id.* at 256, 106 S.Ct. 2505. Summary judgment should only be granted if no rational factfinder could find in favor of the non-moving party. *Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 721 (2d Cir. 1994).

### A. *Motion to Strike Kidder's Summary Judgment Motion*

Before reaching the merits of Kidder's summary judgment motion, I must first consider IAG's motion to strike Kidder's motion on the basis that it relies on a multitude of documents that were not properly authenticated in violation of Fed.R.Civ.P. 56(e).

While a party may challenge documentary evidence submitted in support of a summary judgment motion on the ground that it constitutes unauthenticated or inadmissible material, *see* Moore *et al., Moore's Federal Practice* ¶ 56.14[4][a] (3d ed.1997), it is also true that "[t]he court may permit affidavits to be *supplemented* or opposed by depositions, answers to interrogatories, or *further affidavits.*" Fed.R.Civ.P. 56(c) (emphasis

added). In response to IAG's motion to strike, Kidder submitted numerous additional affidavits purporting to authenticate the materials challenged by IAG. Although Kidder did not seek the Court's permission to augment the documentary materials in this manner, I do not regard that omission as fatal. Rule 56(e) grants me the discretion to permit the filing of such supplemental materials and does not specify when that permission must be granted. Kidder's procedural transgression is not so extreme as to warrant dismissal of its entire motion. I grant Kidder permission *nunc pro tunc* to file the supplemental affidavits as an acceptable response to IAG's challenge to its evidence.

Rather than request that the motion itself be stricken, a more common and, perhaps more appropriate, response to a summary judgment motion that contains allegedly defective documentary support is to object to the use of the offending evidence in support of the motion. IAG has done this by requesting the Court, in the alternative, to strike much of Kidder's supportive evidence as unauthenticated and/or inadmissible. Predictably, Kidder opposes the request. In the interest of efficiency and to prevent unnecessary admissibility decisions that amount to dicta, I believe that it would be prudent for me to consider such a request only as to each piece of evidence necessary to resolution of the motion. Since, as will become clear below, I do not regard any of the challenged documents as critical to my resolution of any aspect of Kidder's summary judgment motion, I need not resolve the authenticity and admissibility issues IAG has raised. IAG's motion to strike Kidder's motion is therefore denied.[2]

### B. *Lost Profit Damages*

█ The bulk of damages sought by IAG takes the form of lost future profits of enormous magnitude. IAG's expert calculates lost profits in the range of $60 million to $144 million. *See* Affidavit of Debra Freeman ("Freeman Aff."), Ex. 9 at ¶ 18. IAG argues that Kidder is liable for all the income that

---

**2.** Of course, this does not preclude IAG from raising admissibility and authenticity challenges

to the same evidence at trial.

IAG would have earned on transactions involving loans originated by AMN for three to five years after June 1994, were it not for the improper actions by Kidder in filing this lawsuit and serving the order of attachment which IAG claims made any such future transactions impossible. IAG does not seek lost profits arising from the January, 1994 contract between Kidder and IAG. Instead, the lost profits it aims to recoup derive from transactions with First Boston (including the June 1994 whole loan sale) and other unspecified parties.

Kidder seeks dismissal of IAG's lost profit damages as unduly speculative. Because I agree that the evidence wholly fails to establish IAG's lost profits as provable to a reasonable degree of certainty, I conclude that it is not entitled to lost profit damages.

■■■■ Parties may recover lost profits as an element of damages under New York law.[3] Pursuant to New York's relatively demanding standard for an award of lost profits, such damages must be proven with "reasonable certainty." *Kenford Company, Inc. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234 (1986) (per curiam). While lost profits need not be established with "mathematical precision," they must be "capable of measurement based upon known reliable factors without undue speculation." *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 916, 624 N.E.2d 1007 (1993). Damages that are merely "speculative, possible or imaginary" do not meet this standard. *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d 234. Although the standard of reasonable certainty applies equally to both established and new businesses, new businesses must meet a higher evidentiary burden in satisfying this standard, "for the obvious reason that there does not exist a reasonable basis of experience upon which to

estimate lost profits with the requisite degree of reasonable certainty." *Id.*

IAG's claim for lost future profits stems from its professed inability to enter into transactions with First Boston and other investment banks or financial institutions involving either the sale, or the apparently more lucrative securitization, of AMN-originated loans. IAG claims that after Kidder filed the lawsuit and obtained the order of attachment, both AMN and First Boston refused to have any further dealings with IAG. According to IAG, this proved fatal to its business prospects which were dependent upon its exclusive contract with AMN to purchase its loans. Once it could no longer count on AMN as a source of loans, and in the absence of any entity to underwrite a securitization for, or to purchase, such loans, IAG's business ceased to exist.

The only concrete transaction that IAG identifies as a source of lost income is the First Boston whole loan sale transaction in June of 1994. IAG contends that it was ultimately squeezed out of this transaction, and the approximately $791,261 in fees it was owed, as the result of the filing of the Kidder lawsuit. However, in addition to that alleged contract, IAG does not, and apparently cannot, identify a single contract or a single potential transaction in which IAG was involved from which lost profits can be derived. Moreover, because it was a new business that had never engaged in the purchase and sale of loan receivables and, with the exception of a few minor investments in trust certificates, had apparently never performed any business at all, IAG also lacks any established income stream or historical performance against which to compare its lack of income after the lawsuit. *Cf. Treasure Lake Associates v. Oppenheim,* 993 F.Supp. 217, 220 (S.D.N.Y.1998) ("Unlike with established businesses, a new enterprise offers little or

---

**3.** Kidder argues, without opposition, that New York law should be applied in considering IAG's lost profits claim. The parties' briefs refer only to New York law. Given the New York venue of the lawsuit and order of attachment from which the lost profit damages in this claim flow, I agree that New York law should apply to consideration of the counterclaims sounding in tort—which are the only counterclaims for which IAG seeks lost

profits. *See, e.g., Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1031 (2d Cir.1996) ("the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders") (citing *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277) (1993).

no record of past performance from which to project future performance.")

To establish lost profits in these circumstances, IAG relies on a report by its accounting expert, Michael F. Horn, which calculates IAG's lost future profits by assuming, among other important factors: (1) that AMN would have originated $240 million in loans per year for three to five years after June 1994;[4] (2) that IAG would have obtained a warehouse facility to finance the purchase of these AMN loans; (3) that IAG would have engaged in whole loan sales of between $13 million and $80 million per year for three to five years; and (4) that IAG would have issued and fully sold into the market between $80 million and $180 million per year of securities backed by AMN auto loan receivables for three to five years. Horn's report also estimates a plethora of other factors affecting his calculation, such as: the default rate on the loans, the interest rate to be paid by IAG on the warehouse facility, the portion of the interest rate on the loans to flow through to IAG, the structure of any securities issued (for example, subordinated or unsubordinated), the interest rate to be paid by IAG to investors on the securities, the ability to obtain insurance on the loans and/or the securities, the credit rating given to the securities (which in turn affects the interest rate to be paid on the securities), the transaction costs to IAG, and IAG's operating expenses. Each one of these factors was by necessity estimated or assumed by Horn because IAG did not have any definite or even contemplated future transactions for which any of these terms were known.

This calculation, which assumes the occurrence of numerous successive hypothetical transactions, constitutes precisely the sort of conjecture that the reasonable certainty standard prohibits and will not support an award of lost profit damages under New York law. The leading New York case establishing the standard for recovery of lost profits is *Kenford v. County of Erie, supra*. *Kenford* involved the County of Erie's breach of an agreement which called for the construction of a domed athletic stadium by the County and gave plaintiff the right to manage the stadium for a 20–year period. Because the stadium was never constructed, the plaintiff sought recovery of lost prospective profits principally from income it would have received from its management of the stadium during the proposed 20–year period. In reversing the jury award of lost profit damages as unduly speculative, the Court of Appeals observed that the "quantity of proof is massive and, unquestionably, represents business and industry's most advanced and sophisticated method for predicting the probable results of contemplated projects." 67 N.Y.2d at 261–62, 502 N.Y.S.2d at 133, 493 N.E.2d 234. Nonetheless, despite the "massive quantity of expert proof," the calculations rested precariously on uncertain factors, including the assumption that the stadium would have been built, used and operated successfully, attracting sporting and other entertainment events for 20 years. The court held this proof insufficient to support the jury award:

> Quite simply, the multitude of assumptions required to establish projections of profitability over the life of this contract require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty.

67 N.Y.2d at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234. The assumptions inherent in IAG's lost profits calculation and the fact that it presumes the consummation of future uncertain transactions makes this case strikingly analogous to *Kenford* and equally founded upon on a thin web of speculation.

Several other cases applying the *Kenford* analysis prove instructive in assessing the sufficiency of lost profits proof which predicts of the occurrence of a numerous contingencies, as it does in this case.

---

**4.** In making his calculation, Horn selected a profits horizon with three years at the low end and five years at the high end. The low end was chosen because it was the period Kidder used to formulate its damage request in the present lawsuit based on the duration of the Kidder/IAG contract. The five-year range was chosen by Horn because he believed it was "reasonable and foreseeable." *See* Freeman Aff., Ex. 9 at ¶ 23.

*Jean–Louis David v. The Glemby Company, Inc.*, 717 F.Supp. 162 (S.D.N.Y.1989) involved the breach of a contract requiring the defendant to establish several hair salons in plaintiff's name. Plaintiff sought damages, based on expert calculations, for lost profits from hair salon franchises it planned to sell after the prototype salons to be opened by defendant had served to establish plaintiff's trade name in this country. The court rejected plaintiff's claim for lost profits damages, holding that the defendant was not responsible for plaintiff's lost profits arising from "other contracts that plaintiff would have made with other parties based on its earlier success." *Id.* at 169. Despite the fact that the damage calculations were "extensive" the court found them unduly speculative because:

> Plaintiff's calculations assumed not just that the prototypes would be successful, but also that their success would be so great as to allow David to sell 576 franchise salons of a different type and that each of these franchises would have survived and prospered.

*Id.* at 170.

In *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326 (2d Cir.1993), a trademark search service brought suit against a software design firm for alleged breach of a contract which required the defendant to create for the plaintiff a trademark database and search system. The Second Circuit held that plaintiff's claim for future profits from in-house trademark searches and sales of disks providing direct access to plaintiff's database should not have been presented to the jury because it was incapable of proof with reasonable certainty as a matter of law. While the proof of lost profits was notably voluminous, the court found that it consisted of a "network of conjecture." *Id.* at 334. In particular, the plaintiff's accounting expert

> assumed an abrupt expansion of the market for trademark search services, assumed that [plaintiff] would reverse the long decline in its market share, assumed that [plaintiff's] historically aggressive competitors would take no measures to counter [plaintiff's] ascendancy, and pre-

dicted which choices customers would make among a variety of new and old search technologies—all of these assumptions reduced to speciously exact dollar amounts and spun out to the year 1998. *Id.* at 333.

In *Three Crown Limited Partnership v. Salomon Brothers, Inc.*, 906 F.Supp. 876 (S.D.N.Y.1995), plaintiffs brought an action under federal antitrust and securities fraud laws alleging that the defendant's manipulation of the U.S. treasuries market increased the price of certain notes in which Three Crown held short positions. The increase, in turn, adversely affected Three Crown's ability to finance its positions in those notes and ultimately destroyed its business. Three Crown sought to recover the profits it would have received if it had been able to continue its trading strategy and to reinvest the profits earned therefrom without the interference of defendants. According to the court:

> Three Crown seeks to recover profits from investments it never made on securities it never purchased or sold, based on the theory that as a consequence of Defendants' manipulation of the market, Three Crown was not able to engage in those unnegotiated and unconsummated trades.

*Id.* at 884. In attempting to prove lost profits damages, the plaintiffs provided expert calculations resting upon underlying assumptions about the U.S. treasury security market conditions, the kind of trading strategy Three Crown would have engaged in, the prices of unmanipulated notes, the financing rates Three Crown would have paid in maintaining its positions and the investments Three Crown would have made if it had maintained its strategy. *Id.* at 883. In granting summary judgment to defendants, the court rejected plaintiffs' lost profits claim as "purely speculative," *id.* at 883, and found that the evidence did not support a finding that Three Crown would have otherwise pursued its trading strategy, a factor that underlay the lost profits award. *Id.* at 888.

Calculations based on a "series of assumptions and projections" were also held to prevent lost profits from being reasonably certain in *Summit Tax Exempt L.P.*

*II v. Berman,* No. 88 Civ. 5839(RJW), 1989 WL 152796 (S.D.N.Y. July 19, 1989). The plaintiff in *Summit* alleged that the defendants breached a contract requiring the defendants to make improvements on a residential rental development. One of the defendants asserted a counterclaim alleging that plaintiff breached its agreement to provide financing for the project and sought to recover the profits it would have earned from the rental of apartments which were never built as the result of plaintiff's failure to provide the financing. The court flatly rejected the defendant's lost profits damages as "utterly fanciful" because they rested upon "a large number of uncertain events and projections." *Id.* at *7. As the court noted:

> To be entitled to lost profits, [defendant] would have to establish (1) that he was unable to obtain an alternative source of the $15,000,000 financing . . .; (3) that [defendant] would have been able to complete on schedule the initial 500 units in accordance with the terms of the Agreement and the subsequent 1,700 units; . . . (5) that all units could be constructed at [defendant's] current cost projections; (6) that the [project] would be capable of sustaining a 95% occupancy rate over a 30 year period; . . . and (8) that operating expenses would remain constant over a 30 year period.

*Id.* The court therefore dismissed defendant's counterclaim as asserting only speculative lost profits damages and awarded sanctions under Fed.R.Civ.P. 11 on the improperly asserted damages claim. *See also Treasure Lake Associates,* 993 F.Supp. at 220 (in case involving damages arising from improperly filed notice of pendency encumbering real property, court dismissed plaintiffs' claim for lost profit damages founded upon their inability to sell portions of the property as planned, in part because the contracts with prospective purchasers contained a number of contingencies that plaintiffs could not prove would have been fulfilled in the absence of the notice of pendency); *Perico, Ltd. v. Ice Cream Ind., Inc.,* No. 87 Civ. 4211(MBM), 1990 WL 11539, at *6 (S.D.N.Y. February 9, 1990) (plaintiff's future profits damages dismissed as specula-

tive because "[p]laintiff's potential profits in the low calorie frozen dessert business, especially those it expects to reap fifteen years hence, depend on numerous factors, none of which could be measured with any degree of certainty"); *RMLS Metals, Inc. v. International Business Machines, Corp.,* 874 F.Supp. 74, 76 (S.D.N.Y.1995) (lost profit damages in claim alleging IBM's breach of a contract allowing plaintiff to recover precious metals by recycling IBM's computer scrap were held impossible to calculate with reasonable certainty, where plaintiff had no track record in the recovery of metals from IBM products and the volume of metals expected to be recovered was uncertain).

The theme that emerges from these cases is clear: a claimant cannot establish lost profits with the law's requisite certainty where its calculation is dependent upon a host of assumptions concerning uncertain contingencies, and applies numerous variables about which an expert can only surmise.

As noted, Horn's calculation at a minimum formulates assumptions concerning the steady volume of loans generated by AMN and sold to IAG, the ability of IAG to obtain financing to purchase the loans, the ability of IAG to sell the loans to willing purchasers at a price high enough to enable it to reap a profit, the ability of IAG to retain an underwriter for the issuance of securities backed by AMN loan receivables, and the ability of an underwriter to successfully sell all of the securities into the market on a sustained basis. Each of these fundamental assumptions in turn is affected by numerous variables. For example, the ability to sell a security into the market depends in part on the interest rate paid on the securities, which is, in turn, affected by the credit rating given to the securities and the availability of insurance covering payment of interest and principal on the securities. *See* Freeman Aff., Ex. 9 at ¶¶ 53–55. Similar to those in *Kenford* and its progeny, IAG's expert calculations are premised upon a variety of assumptions about hypothetical deals continuing successively (and successfully) for several years by an entity that had no historical experience in the particular business for which it seeks lost profits. These cases make evident that IAG,

a fledgling, unproved business, cannot prove damages with reasonable certainty in the face of such extensive assumptions.

In an attempt to show the reasonableness of the assumptions, IAG argues that (1) the calculations were made using the same estimates Kidder used in Kidder's own profit projections with respect to the securitization transaction it had proposed to IAG before the filing of this lawsuit, and (2) many of the assumptions are supported by reference to AMN's actual business performance after June 1994. Neither of these arguments holds weight.

In connection with the first argument, the parties are at variance over whether or not IAG's expert in fact used the same estimates that Kidder used in calculating its projections at the time of the proposed securitization and whether Kidder's projections were in fact based on the reality of any deal it would have ultimately consummated with IAG. But, even assuming IAG is correct in this regard, it cannot erase the patently speculative nature of its lost profits proof by analogizing assumptions Kidder made in a negotiated transaction, whose parameters were essentially known, to hypothetical deals with numerous unknown terms.[5]

In support of its argument, IAG cites three cases in which internal profit projections made by one of the parties to a transaction were held to support an award of lost profits. In *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir.1992), the court held that documents given to the plaintiff by the defendant describing the projected average financial performances of defendant's franchises during negotiations regarding plaintiff's purchase of a franchise could have provided the jury with a reasonable basis for calculating lost profits because the figures had been presented by the defendant as an indication of what plaintiff could earn, and because the projections were actually

reached by franchises in at least one region. In *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir.1987), the court held that a full year of actual profits prior to the alleged breach of a contract making plaintiff the defendant's exclusive sales representative to the military, together with a pre-breach sales projection made by plaintiff's former sales manager and the fact that plaintiff typically had longstanding relations with its clients, were sufficient to support an award of lost profits damages. In *Care Travel Company, Ltd. v. Pan American World Airways, Inc.*, 944 F.2d 983 (2d Cir.1991), a travel agency sued the defendant airline for breach of a contract giving plaintiff the exclusive right to sell tickets on two of the airline's routes. The court held that the lost profits proof, which relied in part on defendant's reports of actual sales made by the plaintiff and its competitor, as well as a report by the defendant estimating the percentage of sales that would have been attributable to the two routes for which plaintiff claimed it had exclusivity, was sufficient to support the jury award.

IAG's reliance on these cases is misplaced. In each case the court noted that factors other than the projections, such as the parties' established course of business or the fact that the projections were borne out by actual performance, helped make the damages provable with reasonable certainty. More importantly, however, each involved projections related to the particular contract or proposal at issue between the parties. None of these cases stands explicitly or implicitly for the proposition that projections which may have been considered reasonable for a concrete transaction between two parties can support lost profit damages for different, hypothetical transactions not involving the party who made the projections.

IAG's reliance upon AMN's actual post-June 1994 performance to confirm the rea-

---

5. The reasonableness of such projections is even less apparent where, as here, the projections were made preliminarily for a transaction, whose terms were somewhat in flux, that was not even consummated. Moreover, Kidder's projections were not based on IAG's actual performance in similar transactions because the company had no track record. Instead, Kidder's projections are replete with many of the same assumptions that make IAG's calculations speculative including the ability to sell the securities into the market at particular prices. As such, it is not manifest that such projections would be a reliable source of certainty in calculating lost profit damages from the Kidder/IAG contract, much less for other hypothetical deals.

sonableness of the assumptions is equally uncompelling. IAG argues that (1) the volume levels assumed by Horn are borne out by the volumes of loans actually originated by AMN in the years following the alleged misconduct of Kidder, and (2) the fact that AMN engaged in several securitization transactions and whole loan sales after June 1994 lends support to the proposition that IAG would have been able to consummate similar deals involving the same loans.

IAG in essence argues that it should be at least partially equated with AMN for purposes of determining the reasonableness of certain of the key assumptions its expert made. In so doing, IAG loses sight of the fact that selling the same product does not make two entities the same company with the same ability to enter into relevant transactions. Several factors other than the product offered affect the ability of a company to obtain financing, to sell a product into the market and to sustain relationships with investment banks. Primary among these are the reputation of the individuals comprising the management team and the company's historical track record in servicing its debt. AMN was an established company with an experienced management team. It had a demonstrated history of commercial and investment banking relationships and a track record of transactions, including loan sales and securitization programs, beginning in at least 1993. IAG, by contrast, was a new company that had never sold AMN loans or receivable-backed securities into the market. It had different management and (besides Kidder) no established investment banking relationships.[6] The fact that AMN had demonstrable experience and IAG did not, es-

tablishes one material difference between these two companies that prevents reliance on AMN's performance to support the reasonableness of IAG's lost profits calculation. At most, the fact that AMN established a post-June 1994 track record in originating a certain volume of loans and selling and securitizing them raises the possibility that IAG *could* have purchased, sold and securitized these loans—but might just as readily have not. This is not reasonable certainty.

Finally, IAG argues that it should be afforded flexibility in proving lost profits because Kidder's misconduct prevented such damages from being proven with certainty. This argument is without merit. In the first place, its asserted foundation is flawed. One Second Circuit decision upon which it relies, *Western Geophysical Co. of America, Inc. v. Bolt Associates*, 584 F.2d 1164, 1174 (2d Cir. 1978), applied the "rational basis" criteria for determining lost profit damages that was later specifically rejected in *Kenford*, 67 N.Y.2d at 262, 502 N.Y.S.2d at 133, 493 N.E.2d 234 ("It is our view that the record in this case demonstrates the efficacy of the principles set forth by this court in *Cramer v. Grand Rapids Show Case Co.* (223 N.Y. 63, 119 N.E. 227, *supra* ), principles to which we continue to adhere. In so doing, we specifically reject the 'rational basis' test enunciated in *Perma Research & Dev. Co. v. Singer Co.*, [542 F.2d 111 (2d Cir.1976) ] and adopted by the Appellate Division.") Another Second Circuit case IAG cites, which also relies in part on *Perma Research*, did not reconcile its dicta that flexibility is appropriate when the defendant's misconduct prevents certainty, with the "reasonable certain-

---

**6.** IAG's alleged discussions with First Boston concerning the possibility of future transactions (beyond the June 1994 whole loan sale) does not furnish certainty with respect to its ability to find partners with whom to do future deals. Courts have denied lost profits as speculative even when they arose from the inability to fulfill *existing* contracts. *See, e.g., Treasure Lake Associates*, 993 F.Supp. at 220 (fact that plaintiffs had actual contracts with prospective purchasers of real property that were never fulfilled due to defendant's wrongful filing of notice of pendency over property was not sufficient to warrant lost profit damages where plaintiffs could not show the contracts' contingencies would have been met

absent defendant's actions). In light of the fact that no concrete proposal was discussed between IAG and First Boston and discussions never reached the level of an agreement to engage in future transactions, IAG can hardly argue that such discussions make its damages any less uncertain. *Cf. Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 373, 590 N.Y.S.2d 425, 429, 604 N.E.2d 1356 (1992) (award of lost profit damages resulting from breach of an "agreement to negotiate" reversed as unduly speculative; court would not allow lost profits from the "prospective terms of a non-existent contract that the city was fully at liberty to reject").

ty" requirement of *Kenford*. *Lamborn v. Dittmer*, 873 F.2d 522, 532–33 (2d Cir.1989).

Moreover, because it is nearly always the case that the alleged wrongdoer's conduct alters the plaintiff's future course of dealing and therefore prevents lost profits from being readily ascertainable, the standard in such cases cannot be that the reasonable certainty requirement is relaxed, otherwise that exception would swallow the rule. This contention is in any event not supported by a review of relevant cases. For example, in *Kenford*, the defendant's alleged breach of a contract by failing to build a stadium prevented the plaintiff from being able to determine the amount of income it would have made on its contract to manage the never-constructed stadium. *See* 67 N.Y.2d at 260–61, 502 N.Y.S.2d at 132, 493 N.E.2d 234. In *Three Crown Limited Partnership*, the defendants' alleged manipulation of the market prevented Three Crown from pursuing its profitable trading strategy and drove it out of business. *See* 906 F.Supp. at 880. But, neither of these cases diminished the plaintiff's burden or shifted the consequences of the uncertainty onto the defendant. To the contrary, in *Kenford*, the court recognized the higher evidentiary standard imposed on the plaintiff because it was a new business. Indeed, to give IAG extra latitude in making its case for lost profits would run contrary to the settled principle that as a new business with no established track record in the purchase and sale of AMN loans, IAG must meet "more stringent requirements" in order to recover lost profits. *See International Telepassport Corporation v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir.1996) (recognizing that "there are no reported decisions since the Court of Appeals' decision in [*Cramer v. Grand Rapids Show Case Co.*, 223 N.Y. 63,

119 N.E. 227 (1918) ] that have affirmed the award of lost profits to a new business").

For "reasonable certainty" to have substance, the lost profit calculation must have a more concrete foundation than that established here, especially since IAG was a new business without a historical basis from which to estimate profits. To be sure, AMN did go on to generate, sell and securitize demonstrable volumes of loans. But IAG, an unrelated and unproven company, cannot just step into the shoes of AMN for purposes of calculating lost profits as though AMN were simply an extension of the neophyte IAG. Despite the extensive calculations made by IAG's expert, undoubtedly applying the latest accounting and economic principles, the assumptions it rests upon prove too unsupportable and far-reaching to be reasonably certain. *Cf. Kenford*, 67 N.Y.2d at 261–62, 502 N.Y.S.2d at 132–33, 493 N.E.2d 234 ("We note the procedure for computing damages selected by DSI was in accord with contemporary economic theory and was presented through the testimony of recognized experts.... Indeed, it is difficult to conclude what additional relevant proof could have been submitted by DSI in support of its attempt to establish, with reasonable certainty, loss of prospective profits. Nevertheless, DSI's proof is insufficient to meet the required standard.").

Mindful that I must guard against presenting "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it," *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.1962) (Friendly, J.), I conclude that IAG is not entitled to lost profit damages as a matter of law.[7]

---

7. It appears from Horn's reports that IAG seeks lost profits arising out of the June 1994 First Boston whole loan sale transaction. I regard such damages as standing on a wholly different footing from the other lost profits IAG seeks. While Kidder raises other problems with this contract (*see* Section D *infra*) I do not read Kidder's brief as arguing that lost profits arising from that transaction should be dismissed as speculative. Nor do I consider them speculative. IAG alleges that it entered into an agreement requiring payment of specific fees, the parameters of the transaction were explicitly discussed and set forth in a Purchase Agreement, and the transaction was in fact consummated, albeit without the participation of IAG. Accordingly, because there is no reason to consider these damages as unprovable with a reasonable degree of certainty, IAG's claim for lost profits arising from that transaction may stand.

Because I have dismissed the remainder of IAG's lost profits claim as speculative, IAG's expert report and rebuttal report are also precluded by Fed.R.Evid. 702, because they rest upon the same assumptions I have determined render IAG's lost profits claim unduly speculative. *See,*

## C. *Dismissal of Counterclaims Based upon an Illegal Contract*

■ Kidder seeks to dismiss Count Three of the Amended Counterclaim, alleging tortious interference with contractual and business relations with AMN and First Boston, and Counts Four and Six, alleging malicious prosecution, abuse of process and wrongful attachment, as arising from and requiring enforcement of an illegal contract, in violation of New York public policy. *See, e.g., McConnell v. Commonwealth Pictures Corp.,* 7 N.Y.2d 465, 469, 199 N.Y.S.2d 483, 485, 166 N.E.2d 494 (1960) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose.") (internal quotations omitted).

The contract in question (hereinafter referred to as the "Newco contract") is a September 20, 1993 agreement signed by Stephen Raskin (President, director and majority shareholder of AMN), Patrick Ghere (Executive Vice President, director and majority shareholder of AMN), Herbert Howard (Chairman, CEO and President of Memorial Bank) and George Kremer (majority shareholder of Lodestone Bancshares, Memorial Bank's holding company), which called for the establishment of entity referred to as "Newco,"[8] as a company whose object was to obtain a revolving credit line to finance the purchase of car loan receivables from AMN on an exclusive basis and securitize and sell those receivables into the market. It is common ground that IAG N.V. was incorporated in November, 1993 as the entity contemplated by this contract.

Kidder maintains that this contract amounted to self-dealing by each of the signatories in violation of their fiduciary duties to the AMN minority shareholders (in the case of Raskin and Ghere), the board of Memorial Bank (in the case of Howard) and the minority shareholders of Lodestone Bancshares (in the case of Kremer).

The alleged self-dealing Kidder envisions arises from several core provisions of the agreement. First, the contract requires the Newco profits to be paid to accounts designated by the four signatories, which Kidder contends means that the financial benefit Newco derived from the sale and securitization of AMN loans was to go directly into the pockets of Raskin and Ghere at the expense of AMN minority shareholders. Second, the contract requires the signatories to "maximize" Newco's profits. In Kidder's view, this means that the four signatories were bound to maximize Newco's profits at the expense of AMN and Memorial Bank. Third, Kidder maintains that by agreeing that Newco would have the exclusive right to purchase AMN's loans, Howard and Kremer improperly diverted this business opportunity from Memorial Bank to an entity in which they had a personal financial interest. Kidder contends that these alleged terms, together with the express requirement that the contract be held confidential, constitute a scheme to defraud the entities to which fiduciary duties were owed, in violation of an astonishing array of criminal laws. Not surprisingly, IAG vigorously resists Kidder's interpretation of the contract and its characterization as an illegal fraudulent scheme.

Having considered the parties' briefs and accompanying affidavits and exhibits, I conclude that the existence of several disputed issues of material fact bearing upon the alleged illegality of the contract preclude Kidder's motion for summary judgment.

■ Before I come to the disputed factual issues, however, I raise two points not addressed by the parties which could affect the ultimate enforcement of this agreement. First, it is not a foregone conclusion that New York law would preclude enforcement

---

*e.g., Boucher v. Suzuki Motor Corp.,* 73 F.3d 18, 22 (2d Cir.1995) (expert testimony which is based on "speculative assumptions" not admissible). However, to the extent IAG intends to rely on portions of the reports addressing lost profits arising specifically from the June 1994 First Boston transaction, I can discern no similar deficiencies that would preclude submission of its expert calculation and expert testimony concerning lost profits on that transaction.

**8.** "Newco" is presumably shorthand for "New Company."

of this contract, even if it constituted a violation of the parties' fiduciary duties and a concomitant violation of certain criminal statutes. Every illegal contract is not unenforceable *per se* under New York law. Rather, when determining whether to enforce the provisions of an illegal contract, courts weigh a variety of factors, such as the repugnance of the illegality, the express provisions of the statute violated and the public policy considerations in refusing to allow recovery under the contract. *See generally Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 385, 604 N.Y.S.2d 900, 906, 624 N.E.2d 995 (1993) ("While some bargains are so offensive to society that courts will not entertain the action—essentially leaving the parties where they are—in other cases an illegal agreement is not so repugnant and may be enforced. It is all a matter of degree.") (citations omitted); *Murray Walter, Inc. v. Sarkisian Brothers, Inc.*, 107 A.D.2d 173, 486 N.Y.S.2d 396, 399 (3d Dep't 1985) (the fact that contract violated Federal tax law did not automatically render contract unenforceable); *accord* Restatement (Second) of Contracts § 178 cmt. b (1981) ("In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms."). Because the parties have not addressed this issue in their briefs and because factual issues exist precluding a present determination of whether the Newco contract is indeed illegal, I intimate no present view on the matter. I simply note that it is not obvious that the violation of fiduciary duties of the magnitude alleged here constitutes the kind of illegal conduct that would render unenforceable the exclusivity provision in the contract.

Moreover, even if a portion of the contract were held to be illegal, that finding would not automatically preclude enforcement of another, legitimate provision of the agreement. When a contract contains both lawful and unlawful objectives, New York courts often enforce legal components of an agreement where the "illegal aspects are incidental to the legal aspects and are not the main objective of the agreement." *Artache v. Goldin*, 133 A.D.2d 596, 519 N.Y.S.2d 702, 705 (2d Dep't 1987) (citation omitted); *see also Triggs v. Triggs*, 46 N.Y.2d 305, 310, 413 N.Y.S.2d 325, 327, 385 N.E.2d 1254 (1978) (enforcing lawful stock purchase provision of a shareholders' agreement despite fact that agreement contained illegal provisions regarding the election and compensation of corporate officers). As I understand IAG's claims, the exclusivity provision, which was arguably the main objective of the contract, is the only provision implicated by its counterclaims. Accordingly, if it is ultimately determined that the Newco contract is illegal due to the profit participation of Raskin and Ghere, but that the exclusivity provision alone did not constitute a breach of fiduciary duty by Howard or Kremer (because it was disclosed to the Memorial Bank board, for example), application of the balancing test could conceivably result in the enforcement of the exclusivity provision. Because, for the reasons set forth below, I conclude that issues of fact exist as to the illegality *vel non* of the contract which preclude summary judgment, I do no more than raise these related questions now, leaving their resolution for another day.

Kidder argues that the contract unambiguously demonstrates the individual signatories' intention to personally reap all of the profits of Newco. The provision at issue states:

> Newco will pay a total of 50% of its net income (after tax) to A and B as per their separate instructions into account(s) designated by A, resp. B and Newco will pay the other 50% to C and D as per instructions.

Freeman Aff., Ex. 38 at IAG 3056. On the first page of the agreement, A, B, C, and D are defined as, respectively, Raskin, Ghere (collectively referred to in the contract as "A/B"), Howard and Kremer (collectively referred to in the contract as "C/D")—with no reference to their respective executive capacities. IAG has submitted evidence demon-

strating that the parties intended for the A and B profits to be paid to AMN, not to Raskin and Ghere as individuals. If this is the case, the bottom drops out of Kidder's argument that Raskin and Ghere violated their fiduciary duties by profiting at the expense of AMN. Kidder argues, however, that IAG cannot submit any extrinsic evidence to demonstrate the parties' intent as to profit distribution because the contract is unambiguous and fully integrated. I am not persuaded.

The parol evidence rule does not preclude the admission of evidence to show that an unambiguous contract is illegal. *See 97 Fifth Ave. Corp. v. Schatzberg,* 283 A.D. 407, 128 N.Y.S.2d 264, 266 (1st Dep't 1954) ("The fact that a contract as embodied in the written evidence thereof is perfectly valid on its face, does not preclude a party when sued thereon from showing the true nature of the contract, and its consequent illegality."). My research has discovered no case that directly addresses the contrary proposition implicated here—whether such evidence can be admitted to establish the legal intent of the parties when the contract has been attacked as illegal. However, two cases indicate in dicta that such evidence would be admissible. *See Chapin v. Austin,* 165 Misc. 414, 300 N.Y.S. 932 (Sup.Ct.1937) ("[P]arol evidence is admissible either to *establish* or disprove the validity of an agreement which is attacked on the ground of illegality of subject-matter or consideration.") (emphasis added); *Triggs v. Triggs,* 46 N.Y.2d at 315, 413 N.Y.S.2d at 331 (Gabrielli, J. dissenting) ("If it is contended there exist circumstances which might prove that an agreement illegal on its face is in fact legal, the burden of proof as to these extrinsic facts must be placed upon the party who asserts the validity of the facially illegal agreement.") In light of this dicta and the unquestionable admissibility of extrinsic evidence to *show* illegality, I can discern no reason for precluding the admission of extrinsic evidence of the parties' intent to *disprove* Kidder's claim of illegality, particularly since the illegality charged requires specific fraudulent intent as an element. Assuming without deciding that the contract is illegal on its face, allowing IAG to offer evidence negating the fraudulent intent of the parties

as to conduct that would otherwise expose the signatories to criminal liability does not run afoul of the parol evidence rule.

IAG has submitted evidence that establishes the parties' intent that the profits derived from the Newco contract were to be paid to AMN, not to Raskin and Ghere individually. If the profits were to be paid to AMN, Kidder's breach of fiduciary duty charge against Raskin and Ghere fails because AMN and all of its shareholders would have participated directly in the profits of Newco. Raskin testified that he understood that the profits to be paid to accounts designated by A and B in the contract were to be paid to AMN. *See* Affidavit of Samuel Rosenthal ("Rosenthal Aff."), Ex. 11 at 72, 79. Kremer provided similar testimony. *See* Freeman Aff., Ex. 2 at 275–76. This testimony raises a question of fact as to whether Raskin and Ghere were to profit individually from the Newco contract, as the contract might suggest, or whether the profits were to go to AMN.

The claim that Howard and Kremer breached their fiduciary duties is founded upon the premise that the Newco contract obligated Howard and Kremer to "maximize" Newco profits at the expense of Memorial Bank and to usurp a business opportunity from the bank. Nothing on the face of the contract, however, suggests a link between maximizing Newco's profits and disadvantaging Memorial Bank. Kidder briefly argues that the contract obligated Memorial Bank to sell back any AMN loans it owned to AMN and/or to Newco at terms that were disadvantageous to Memorial Bank. While the contract does contemplate the purchase by Newco of AMN loans from Memorial Bank, and Kidder has offered the testimony of Kremer to the effect that the contract obligated Memorial Bank to cooperate in selling back loans to AMN, Kidder offers no evidence that demonstrates that the sale of such loans would have been at disadvantageous terms or would have otherwise harmed Memorial Bank. In its provision giving exclusivity to Newco, however, the contract does indisputably cut Memorial Bank out of an opportunity to purchase AMN loans in the future. Assuming this exclusivity arrange-

ment constitutes self-dealing because it involves diversion by Howard and Kremer of a business opportunity away from Memorial Bank in a venture in which they had some level of financial interest,[9] no breach of fiduciary duty would arise if there was disclosure to, and consent of, the board of Memorial Bank. *Cf.* IAG has raised a triable issue of material fact with respect to whether such disclosure was made.

IAG has submitted the affidavit and testimony of Howard which establish that the board of Memorial Bank was fully aware that Howard, with the bank's blessing, had been attempting for months prior to the execution of the Newco contract to find a replacement for the bank to finance AMN's operations and to be the exclusive purchaser of AMN loans. *See* Affidavit of Herbert Howard ("Howard Aff.") at ¶¶ 4–9; Rosenthal Aff., Ex. 9 at 149, 151. To that end, with the board's knowledge, Howard incorporated an entity called Lodestone Acceptance Group, Inc. ("LAGI") and was appointed an officer and director of LAGI. *See* Howard Aff. at ¶¶ 6–8. Howard's affidavit explains that before IAG was incorporated, and before the Newco contract was executed, AMN and Memorial Bank proceeded with the view that LAGI would enter into an exclusivity arrangement with AMN. Howard Aff. at ¶¶ 6, 7, 9. In addition, IAG has submitted testimony from Howard in which he stated that he disclosed to the bank many of the terms of the Newco contract itself. *See* Rosenthal Aff., Ex. 9 at 188–89.

The evidence proffered by IAG shows that far from being deceptively shut out of the ability to purchase AMN loans, the bank wanted to find a replacement and supported Howard's attempts to establish a third-party entity to enter into an exclusivity arrangement with AMN. The fact that this entity ended up being IAG—not LAGI—makes little difference when the substance of the self-dealing alleged in the Newco contract consisted of the same activity LAGI was planning to undertake with the board's approval. Moreover, Howard testified that he disclosed many of the Newco contract terms to the board—even if Howard's testimony was not the picture of specificity in identifying the terms disclosed. Taken together, Howard's affidavit and testimony give rise to a reasonable inference that the bank was not deceived, and serve to counter the evidence Kidder submitted to show that nothing in the board minutes and memoranda addressed to the board suggests the board was ever informed of the key, allegedly fraudulent details of the Newco contract.

Because I conclude that IAG has submitted valid evidence raising a genuine issue of material fact regarding (1) the alleged secret profit distribution to Raskin and Ghere and (2) the bank's knowledge of and acquiesence in the Newco contract in general, and the exclusivity arrangement in particular, I deny Kidder's summary judgment motion to the extent it seeks dismissal of IAG's counterclaims which are based on rights or interests derived from this contract.

D. *Tortious Interference with Contractual Relations with First Boston*

 Kidder argues that it should be granted summary judgment dismissing IAG's claim of tortious interference with contractual relations with First Boston contained in Count Five because the record lacks any evidence proving an essential element of IAG's claim; namely, that First Boston agreed to pay a 2% structuring fee in connection with the June 1994 transaction to the defendant, IAG N.V., rather than another entity, IAG Receivables Finance Corp. ("IAG R.F.C."). It is undisputed that IAG N.V. and IAG R.F.C. are distinct entities and that IAG N.V. would not have standing to assert a claim for interference with a contract between IAG R.F.C. and First Boston. The

---

9. Although its position is not entirely clear, IAG apparently does not contest that, unlike Raskin and Ghere, Howard and Kremer had some level of personal financial interest in the Newco contract. *Compare* IAG's Local Rule 56.1 Statement ¶ 81 (stating that it was the intention of the parties that any monies paid to A and B would in fact be paid to AMN, but not making any mention of whether monies paid to C and D would in fact be paid to C and D or another entity), *with* ¶ 86 ("Howard believed that no agreement had ever been reached, entitling him to share in the profits personally of Newco ... [testifying] that it was his hope and expectation that what he meant [sic] he would be compensated for his work 'in some way,' without specifying what he meant.")

focus of the parties' dispute is instead whether IAG N.V., not IAG R.F.C., was the intended party to the First Boston transaction.

To demonstrate the record's absence of evidence that defendant was ever a party to a contract with First Boston, Kidder submits several documents generated in connection with the whole loan sale transaction that refer to IAG R.F.C. as a participant and nowhere reference IAG N.V. The documents put forward by Kidder are: (1) two unanimous written consents of the board of directors of IAG R.F.C. dated June 20 and June 24, 1994, authorizing IAG R.F.C. to enter into a Purchase Agreement with First Boston; (2) one unanimous written consent of the board of directors of AMN Receivables Finance Corp. dated June 24, 1994 authorizing participation in the whole loan sale and referencing IAG R.F.C. as a participant in that transaction; (3) a draft dated June 27, 1994 of the Purchase Agreement addressed to AMN and IAG R.F.C. and containing a provision requiring payment of a 2% structuring fee to IAG R.F.C.; (4) two draft opinion letters dated June 30, 1994 [10] and (apparently sent on June 29, 1994) from AMN's lawyers Kutak Rock to First Boston, both referring to IAG R.F.C., not IAG N.V., as a participant in the transaction, and one stating, *inter alia*, that "IAG–NV has never had possession of or an interest in the Receivables" to be purchased by First Boston. Because these documents uniformly refer to IAG R.F.C. as a party to the transaction and do not make any reference to IAG N.V., Kidder contends that these documents show that IAG N.V. was never planning to participate in the transaction.[11]

In *Celotex Corp. v. Catrett*, the Court held that summary judgment must be granted against a non-movant who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. 2548. Where there is a "complete failure of proof concerning an essential element of the nonmoving party's case" all other facts are rendered immaterial. *Id.* at 323, 106 S.Ct. 2548. The movant can meet its burden of demonstrating the absence of a genuine issue of material fact by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once such a showing is made, the nonmovant may defeat summary judgment only by offering evidence demonstrating specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

Kidder correctly notes that an essential element of plaintiff's claim is the existence of a contract between IAG N.V. and First Boston. *See* Memorandum Opinion and Order dated August 27, 1997 ("August 1997 Opinion"), slip. op. at 15. Under *Celotex* all Kidder must do to meet its burden of showing IAG's failure of proof is point to the absence of evidence showing a contract with First Boston in the record. *See* 477 U.S. at 323, 106 S.Ct. 2548. Kidder has done so by merely indicating that there exists no documentary evidence referencing IAG N.V. as an intended participant in the First Boston transaction. Kidder having thus satisfied its burden, IAG must now come forward with evidence tending to show the existence of such contractual relations. I conclude that it has done so.

IAG alleges that the agreement by First Boston to pay a 2% annual structuring fee in

---

**10.** One of the letters is in fact dated June 30, 1993. Given the timetable of the transaction, this is undoubtedly a typographical error.

**11.** IAG objects to the consideration of certain of these documents (the written consents) as inadmissible hearsay. Kidder replies that it is not offering the written consents to prove the truth of the matters stated therein, but rather to demonstrate the *absence of evidence* showing that IAG N.V. was a party to the First Boston transaction. I need not determine for present purposes whether the documents would be admissible under this theory, however, because as discussed *infra*, Kidder need not proffer evidence to demonstrate the lack of proof on this point. Moreover, regardless of whether these documents are admissible, I hold *infra* that IAG has met its burden of offering evidence tending to prove the existence of a contract with IAG N.V.

IAG also objects to the opinion letters as inadmissible because they are drafts which should be presumed to be inaccurate or incomplete. For the same reason, I need not resolve this admissibility question at this stage.

connection with the whole loan sale occurred during a June 24, 1994 conference call with approximately ten participants. Among the participants were Kremer, Howard, Raskin, Patricia Daly (counsel to AMN) and Emily Youssouf (a First Boston employee). It has not been disputed that "IAG" was referred to during the phone call; the only question is what the parties meant by that term and whether the agreement was ultimately made with IAG N.V. IAG offers the following deposition testimony of each of these individuals to show that IAG N.V., not IAG R.F.C., was the intended party to the agreement.

Howard testified that he believed IAG N.V. entered into a contractual relationship with First Boston. *See* Supplemental Declaration of Samuel Rosenthal, Ex. 6 at p. 554.

Kremer testified that although he could not recall whether anyone on the phone call referred specifically to IAG N.V. as the participant in the transaction, "[w]e would have used the word IAG and we would have meant IAG N.V. That was my understanding." He further testified that "I had reason to believe that CS First Boston understood IAG to be IAG N.V. ... [b]ecause to the best of my knowledge they only knew about IAG N.V." Freeman Aff., Ex. 2 at pp. 49–50.[12]

Daly testified in response to a question that asked her what she recalled with respect to "any mention of IAG N.V." in the transaction discussions that, "[t]he circumstances surrounding the transaction ... out of necessity, needed to include IAG N.V. as a party." Rosenthal Aff., Ex. 5 at pp. 56–7. She further explained that because of the "threat of litigation" by Kidder which made First Boston reluctant to do the transaction with any IAG entity, in "later negotiations ... the accommodation was made to include [IAG R.F.C.]" in the Purchase Agreement. *Id.* at p. 90. Finally, Daly stated that "had there not been litigation filed [against IAG N.V.] ... I believe they would have done the deal with IAG N.V." *Id.* at p. 210.

Youssouf testified that she did not "remember" having heard of an entity called

IAG R.F.C. and did not "remember" if First Boston agreed to enter into a transaction with IAG N.V. Rosenthal Aff., Ex. 15 at pp. 77, 111–12. However, she did remember having discussions with Kremer in June of 1994 "concerning CS First Boston doing a transaction with IAG N.V." *Id.* at pp. 77–8.

Lastly, Raskin testified that there was no "question in my mind that [First Boston was] willing to do the transaction with IAG NV if the classification NV makes it offshore." Rosenthal Aff., Ex. 11 at p. 214. He makes fairly clear later in his testimony, however, that he understood IAG N.V. to be the operating company and IAG R.F.C. to be a special purpose corporation and he believed that the deal was with IAG N.V. because he didn't "think you could do a deal with a special purpose corporation without an operating company." *Id.* at p. 216. When specifically asked whether he was assuming that First Boston was prepared to do a deal with "whatever company was the operating company" he responded, "That is correct. Whatever company or companies needed to be in the transaction, they were willing to do a deal with IAG prior to the Kidder lawsuit." *Id.* at p. 217.

In determining whether there exists evidence sufficient to allow a factfinder to reasonably find that IAG N.V. was the intended participant in the transaction, I must view the evidence adduced in the light most favorable to IAG and draw all reasonable inferences in its favor. *See L.B. Foster Co.*, 138 F.3d at 87. Applying these standards, I conclude that IAG has met its burden of coming forward with evidence sufficient to raise a genuine issue of fact relating to whether First Boston and IAG N.V. entered into an agreement.

Although Raskin's testimony is of little value to IAG's claim because it does not clearly state whether he believed IAG N.V. to be the intended participant, the testimony of the four other individuals is more favorable. Kremer testified that he was on the June 24th call as a representative of IAG

---

**12.** Kidder's moving papers asserted in a footnote, without argument, that this testimony is hearsay because it is a summary of a conversation with a third party. However, faced with opposition to this contention raised by IAG's responsive papers, Kidder's reply papers do not renew or support this objection. Accordingly, I decline to address it.

N.V. and that he understood that when he and the others on the phone call talked about "IAG" they were referring to IAG N.V. Moreover, he testified that he believed First Boston shared that understanding because to his knowledge they were not aware of IAG R.F.C. Howard testified that he believed First Boston entered into a relationship specifically with IAG N.V. Youssouf testified that she remembered having discussions regarding First Boston's entering into a transaction with IAG N.V. and having a meeting with Kremer, IAG N.V.'s principal, but could not remember whether she had heard of IAG R.F.C. Finally, and perhaps most significantly, Daly, AMN's counsel, testified that the circumstances surrounding the transaction made clear that IAG N.V. had to be a party to the whole loan sale, that IAG R.F.C. was included in the draft Purchase Agreement as an accommodation to First Boston because of the threat of litigation by Kidder that made First Boston reluctant to do a deal with IAG, and that she believed IAG N.V. would have been a party if it weren't for the lawsuit by Kidder.

These four individuals were all participants on the phone call in which the alleged agreement at issue was formulated and all were personally knowledgeable about the transaction. Although none of them explicitly stated that IAG N.V. was referred to on the call by that precise name rather than the shorthand "IAG," two of them said they believed First Boston had entered into a contract with IAG N.V., one of them said that the deal would have been done with IAG N.V. were it not for the lawsuit and that the documentary references to IAG R.F.C. were an accommodation only after the lawsuit was threatened, and an employee of First Boston said she remembers having had discussions with IAG N.V. and Kremer but does not remember hearing about IAG R.F.C. Notably absent from this testimony is any suggestion that IAG R.F.C. was ever mentioned on the phone call.

While Youssouf's memory of the transaction may be less than complete and Kremer and Daly may have elements of conjecture in their testimony, I cannot dismiss all of this testimony as nothing more than idle speculation. The testimony of these participants in the phone call and, to varying degrees, in the First Boston transaction, shows that they personally either understood the deal as initially (that is, before the lawsuit) including IAG N.V. or understood the discussions to have been with IAG N.V. Whether the basis for these understandings is unsound is not for me to determine. My role on this motion is not to make credibility assessments or to weigh the evidence. Although it may not be overwhelming, I cannot say that a factfinder would be compelled in the light of this evidence to find that no contract with IAG N.V. was intended. To the contrary, I conclude that the collective testimony of these individuals is at least sufficient to support a reasonable inference that IAG N.V., not IAG R.F.C., was the intended party to the alleged agreement with First Boston.[13]

### E. *Wrongful Attachment Under CPLR 6212(e)*

■ Count Four of the Counterclaim seeks damages resulting from a wrongful attachment pursuant to CPLR 6212(e). That rule provides that

> The plaintiff shall be liable to the defendant for all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if the defendant recovers judgment, or if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property. Plaintiff's liability shall not be limited by the amount of the undertaking.

Kidder argues that IAG cannot recover damages pursuant to this statute because no property was ever encumbered. Relying on this Court's August 1997 Opinion, IAG responds that this statute should not be restricted to damages flowing from the actual

---

**13.** To be sure, IAG has not offered any documentary evidence showing that IAG N.V. was a putative participant in the whole loan transaction, presumably because there exists none. However, while this may be a fact of some significance to the jury in weighing the evidence, no legal precept requires IAG to come forward with *documentary* evidence to satisfy its burden on this summary judgment motion.

attachment of property if the procurement of the order of attachment itself caused harm. In the August 1997 Opinion, this Court held that IAG could maintain a counterclaim for malicious prosecution by alleging that the requisite special damages arose from the "real and actual" interference with IAG's property through Kidder's misuse of the provisional remedy of attachment, even though no property was in fact attached. Slip. op. at pp. 11–12. IAG argues that because no principled difference exists between the causes of action for malicious prosecution and wrongful attachment, it should likewise be able to maintain a claim for wrongful attachment without showing that any property was actually attached. For the reasons set forth below, I disagree.

The few cases addressing the issue strongly suggest that the actual attachment of property is a prerequisite to maintaining a cause of action for damages under Rule 6212(e). In *Salamanca Trust Co. v. McHugh*, 156 A.D.2d 1007, 550 N.Y.S.2d 764 (4th Dep't 1989), the plaintiff received an oral order of attachment that did not ultimately lead to the attachment of any property. In these circumstances, the court dismissed the defendant's counterclaim for wrongful attachment under 6212(e), holding:

> The mere fact that property has been subjected to some form of restraint does not serve as a basis for the statutory claim of wrongful attachment. *Damages are not recoverable under the statute unless the property is actually attached.* There was no attachment in this case and therefore, summary judgment dismissing this counterclaim was proper.

*Id.* at 765–66 (emphasis added) (citations omitted). Similarly, in *Augsbury v. Adams*, 108 A.D.2d 978, 484 N.Y.S.2d 962, 963 (3rd Dep't 1985), the court upheld the denial of the defendants' cross-motion for wrongful attachment damages because the request for an attachment order had been denied and therefore no property was attached. As the court observed, "[d]amages are recoverable only when property has been wrongfully attached." *Id.* Although the language of these cases clearly indicates that the actual attachment of property is required, neither case is

directly on point because both involved initial orders of attachment that were either invalid or denied. No reported case addresses the situation at bar where a valid order of attachment does not result in an encumbrance of property.

IAG cautions against reliance on *Salamanca* for the proposition that property must be reached by attachment for a wrongful attachment cause of action to lie, noting that I declined to follow its similar conclusion that property must be attached to assert a malicious prosecution claim. While this argument has a certain logic, there are several important factors that support reliance on *Salamanca* for the proposition that property must be actually attached to maintain a statutory wrongful attachment suit.

Unlike malicious prosecution, wrongful attachment is a creature of statute, not a judicial construct. The narrow reach of damages under the statute is illustrated by one of the cases cited by IAG. In *Provisional Protective Committee v. Williams*, 121 A.D.2d 271, 503 N.Y.S.2d 47 (1st Dep't 1986), the plaintiff obtained a court order on notice temporarily restraining defendants' use of certain funds pending hearing on plaintiff's motion for an order of attachment. The court ultimately denied the motion for an order of attachment and granted the defendants' motion for an award of attorney's fees under 6212(e). The Appellate Division reversed, noting that the restraint of funds pursuant to a temporary restraining order is "not within the ambit of damages recoverable under Section 6212" when the motion for an order of attachment is defeated. *Id.* at 49. Thus, even though the defendants' assets were frozen for five months as a result of plaintiff's resort to the attachment process, the court determined that Rule 6212(e) was not broad enough to allow damages when an attachment order was never actually signed.

Sound policy reasons exist for limiting the availability of damages for a wrongful attachment claim. Rule 6212(e) imposes strict liability for damages—including attorney's fees—arising from the wrongful attachment of property. *See* N.Y. CPLR 6212, McLaughlin, *Practice Commentaries* C6212:8. Because damages are automatical-

ly available, without proof of fault, if an order of attachment is issued and subsequently vacated because attachment was unwarranted, it is appropriate to limit the reach of that strict liability to cases where property is actually attached.

The strict liability for wrongful attachment may be contrasted with damages in a malicious prosecution claim, where a litigant is required to demonstrate a higher standard of culpability on the part of the plaintiff—bad faith. Given these different standards of liability, it is a logical assumption that the reach of damages might be longer in the malicious prosecution action, since the threshold for liability is higher. Indeed, even before 6212(e) was enacted, there was a recognized difference in the availability of damages for the two kinds of claims: "[t]here was no liability at common law for damages resulting from an attachment erroneously granted unless the case was established as one for malicious prosecution." *Siegel v. Northern Boulevard & 80th Street Corp.*, 31 A.D.2d 182, 295 N.Y.S.2d 804, 812 (1st Dep't 1968).

Restricting the statutory availability of damages to those occasioned by the actual encumbrance of property is also consistent with the potential harm sought to be redressed by the provision. The harsh nature of the attachment remedy consists of the "dispossession" of the property "of the owner prior to adjudication to determine the rights of the parties. It violates every principle of proprietary right held sacred by the common law." *Siegel*, 295 N.Y.S.2d at 806 (internal quotations and citation omitted). Because the fundamentally troublesome consequence of the attachment remedy constitutes the dispossession of property, it is a reasonable inference that the damages available to compensate for that harm would be limited to those arising from that encumbrance.

Moreover, it should be recalled that the linchpin of a malicious prosecution claim is "interference" with property which must be "real and actual." *See* August 1997 Opinion, slip. op. at 10. Since the focus of a malicious prosecution claim is the actual interference with property, it should make no difference whether the property interfered with consists of property actually reached by attachment or other property harmed by the utilization of that provisional remedy—interference with property may be real in either event. Under 6212(e), by contrast, it is not "interference" from which the damages directly arise, it is "attachment." This is a specific and narrow statutory term that appears to encompass only actual attachment of property—not the preliminary steps in the process.

While nothing in the above analysis compels a determination that 6212(e) damages require the actual attachment of property, it does demonstrate that there are sufficient differences between the common law malicious prosecution cause of action and the statutory wrongful attachment action to support a conclusion that *Salamanca* and *Augsbury* should be read to preclude recovery under Rule 6212(e) if no property was ever attached. Because it is unquestioned that none of IAG's property was ever reached by the vacated order of attachment, IAG's counterclaim under 6212(e) must be dismissed.

## CONCLUSION

For the foregoing reasons, I conclude that (1) Count Four of IAG's Amended Counterclaim alleging wrongful attachment under N.Y. CPLR 6212(e) must be dismissed and (2) IAG is not entitled to recover lost future profit damages other than those derived from the alleged June 1994 whole loan sale transaction involving First Boston. Kidder's motion for summary judgment is denied in all other respects, as is IAG's motion to strike.

It is SO ORDERED.